# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____
                                )
                                )
RICHARD BROWN *et al.*,         )
                                )
        Plaintiffs              )
                                )
v.                              )        C.A. NO. 05-10188-MEL
                                )
SUFFOLK COUNTY,                 )
        Defendant               )
                                )
_____)

and

_____
                                )
                                )
GIUSEPPE MAROTTA *et al.*,      )
                                )
        Plaintiff               )
                                )
v.                              )        C.A. NO. 05-10032-MEL
                                )
SUFFOLK COUNTY,                 )
        Defendant               )
                                )
_____)

**STATEMENT OF MATERIAL FACTS AS TO WHICH PLAINTIFFS CONTEND
THERE IS NO GENUINE ISSUE TO BE TRIED
PURSUANT TO LOCAL RULE 56.1**

Pursuant to Local Rule 56.1, the Plaintiffs set forth the following facts, about

which they contend there are no genuine issues to be tried.

1.     The Plaintiffs in these related actions case are corrections officers, employed by the Defendant, Suffolk County.[1]

2.     The Plaintiffs are members of a labor organization, AFSCME Council 93, AFL-CIO, (the "Union"), which is presently and was at times relevant to this action, the labor representative for corrections officers employed by Suffolk County.[2]

3.     AFSCME Local 419 is comprised of officers in the classification of "CO-1, CO-2, CO-3, and CO-4", and who are assigned to the Suffolk County House of Correction.[3]  (The caption of the action for these Plaintiffs is *Marotta et al v. Suffolk County*, 05-10032-MEL.)  AFSCME Locals 3643 and 3967 represent Plaintiffs classified as superior officers (JO-4, JO-5, and CO-5) assigned to the Suffolk County House of Correction, and in certain cases, the Suffolk County Jail.[4]  (The caption of the action of the Plaintiffs in this action is *Brown et al. v. Suffolk County*, 05-10188-MEL.)

4.     The Defendant and local unions have been parties to a series of collective bargaining agreements that set forth terms and conditions of employment that uniformly apply to unionized employees, including the employees' hourly "base" rates of pay, and their entitlement to receive other compensation in addition to their base hourly rate, including hourly differentials and lump sum payments (hereinafter, the "premiums").[5]

---

[1] Admitted in Defendant's Answer in *Marotta v. Suffolk County*, 05-10032, ¶ 8; *Brown v. Suffolk County*, 05-10188, ¶ 8.
[2] *Id., see also* "Agreement" in preamble of Ex. 1A, collective bargaining agreement ("CBA") between Suffolk County and AFSCME Council 93, AFL-CIO, Local 419 set to expire June 2005; and Ex. 2A, ¶ CBA between Suffolk County and the AFSCME Council 93 AFL-CIO, Locals 3643 and 3967, set to expire June 2003.
[3] See Ex. 1A, CBA, Article 1
[4] See Ex. 2A, CBA Article 1.
[5] *See* Article XIX in Local 419 CBA's dating from July 1, 1999 to June 30, 2008, Ex.'s 1A through 1D; Article XIX in Locals 3653 and 3967 CBA's dating from July 1, 1998 to June 30, 2003, Ex.'s 2A through 2B.

5.      For example, under the CBA[6] that was set to expire on June 30, 2005 between the Defendant and Local 419, covered union members were entitled to receive premium pay as set forth below:

- "Educational Incentives," including $.72 per hour for having attained an associate's degree, $1.20 per hour worked for the attainment of a bachelor's degree; and $1.44 per hour worked for the attainment of a master's degree (Local 419 CBA; Article XIX, Section 3).

- "Weekend Differential," including $1.00 per hour for all regularly scheduled hours worked between the hours of 11:00 p.m. on Friday and 11:00 p.m. on Sunday (Article XIX, Section 9).

- "Shift Differential," including $1.05 per hour for all regularly scheduled actual hours worked on a night shift (Article XIX, Section 10);

- "Public Safety," including $1.30 per hour for employees graded as CO-1, CO-2, and CO-3, and $1.54 per hour for employees graded as CO-4 (Article XIX, Section 11);.

- "Longevity Pay," in lump sums based on years of service (Article XIX, Section 8);

- A "Fitness Bonus" of $800, payable on or before December 15 each year, for employees who meet the Defendant's "Wellness and Fitness" program requirements (Article XIX, section 14).

---

[6] CBA, Ex. 1A.

6.     Likewise, for Locals 3643 and 3697, the CBA[7] expiring June 30, 2003 promised employees these premiums:

- "Longevity", in amounts ranging from $364 to $1040 based on officers' years of service (Article XIX, Section 7.)

- "Weekend Differential" of $1.00 per hour for all regularly scheduled hours actually worked between the hours of 12:00 midnight on Friday and 12:00 midnight on Sunday (Article XIX, Section 8.)

- "Shift Differential" in the amount of $1.05 per hour for all regularly scheduled hours worked on a night shift (Article XIX, Section 9).

- "Supervisory Differentials", including $1.00 per hour for Shift Commanders, .15 per hour for all Department Heads (Article XIX, Section 10).

- "Public Safety Differential" in the amount of $1.54 for all regularly scheduled hours worked (Article XIX, Section 11).

- "Educational Differential", including $.72 for an Associate's Degree; $1.20 for a Bachelor's Degree; and $1.44 for a Master's Degree (Article XIX, Section 12.)

- A "Fitness Bonus" of $800.00 payable to employees who meet the "Wellness and Fitness" incentive.

---

[7] Ex. 2A.

4

- A "Uniform Allowance" in a lump sum of $450.00, and an hourly differential of $0.22 for all regularly scheduled hours actually worked (Article XVII, Section 3.)

7.    At all times relevant to this action, the City of Boston, through its Central Payroll Unit, has processed the payroll of the Suffolk County Sheriff's Department.[8]

8.    By letter dated November 24, 1998, Virginia Tsei, Boston's Director of Labor Relations, notified all impacted employee unions that the City of Boston was converting its payroll to use PeopleSoft software.[9]  Tsei's letter notified the unions that Boston was considering using PeopleSoft for the purpose of "[c]onsolidating all employee earnings (i.e., base pay and overtime) during each pay period into a single payment."[10]

9.    Prior to the time the City converted to PeopleSoft, all bargained-for shift differentials were included in the Plaintiffs' overtime rates of pay.[11]  The Sheriff's Department determined these rates manually, using its in-house "Data Ease" system, which Peoplesoft replaced.[12] At a hearing on November 13, 2001, related to a prohibited practice charge filed against the Defendant by the union related to the conversion, Maura McDonough, who served as the Assistant Director of Personnel for the Sheriff's

---

[8] Ex. 3, Deposition Transcript of Michael Cawley, p. 9; Ex. 4, Deposition Transcript of Thomas Yotts, p. 9-10.  The Treasurer of the City of Boston also acts as the Treasurer of Suffolk County.  *See* Ex. 4, Yotts Tr./10.
[9] Ex. 5, Letter from Virginia Tsei Notifying Unions of Implementation of PeopleSoft, dated 11/24/98.
[10] Ex. 5, Tsei Letter.
[11] Ex. 3, Cawley Tr./15; Ex. 6, Memorandum of Michael Cawley, p. 1:  "Prior to the conversion to PeopleSoft in October of 1999, our payroll data including OT calculation was processed on Datacase.  The Personnel Division would send a weekly OT disk up to City Hall, which would include the number of OT hours worked multiplied by the FLSA rate. The FLSA rate included payments received for regular hours worked and differentials."
[12] Cawley Memorandum, Ex. 6.

Department before the conversion to PeopleSoft, and its Director thereafter, testified as to

how the Defendant established and paid the Plaintiffs' overtime rates:

> In the Data E's (sic) System, all differentials and regular weekly hourly
> rates were in the system.  So if an officer worked — was on the night shift
> and got public safety differential, then that was included in their OT in the
> sense that if they got 40 hours of public safety, 40 hours of night dif, and
> 40 hours of regular pay, all of that would be added up, divided by 40 and
> that would be their overtime rate.[13]

10.    The conversion of the Suffolk County payroll to Peoplesoft took place in

November of 1999.[14]  Instead of making the manual calculations under Data Ease, the

Sheriff's Department keyed the same data it had manually provided the City directly into

its own computer system; the City Treasurer's office then generated the checks.[15]

11.    The first paychecks cut to Suffolk County employees using PeopleSoft

were issued on November 5, 1999.[16]  McDonough immediately received complaints

from corrections officers that they were being underpaid because the differentials were

not being included in their overtime rate of pay.[17]   Rather, the Plaintiffs' overtime rates

were based on 1.5 times their base hourly rates of pay.[18]  Concerned that this change

violated the FLSA, McDonough contacted the City, and reported the problem.[19]

12.    Reflecting his concern about the situation, on or about January 24, 2000,

Thomas Yotts, the Defendant's Chief Financial Officer, sent a memorandum to Sally

---

[13] Ex. 7, Labor Relations Commission Transcript ("LRC Tr.") p. 70.  McDonough was deposed on June 27, 2007, and was provided a copy of the LRC transcript prior to her deposition. At her deposition, she adopted her testimony.  Ex. 8, McDonough Deposition Transcript, pp. 8-9;  see also Ex. 3, Cawley Tr./19.
[14] Glora Testimony, LRC Tr./15.
[15] Yotts Tr./12-13; see also Cawley Tr./18-19.
[16] Ex. 7, McDonough Testimony, LRC Tr./67.
[17] Ex. 8, McDonough Tr./.13; see also Ex. 11, Affidavit of Thomas Yotts, dated March 19, 2001 (submitted with the Suffolk County Sheriff's Department's response to the Union's prohibited practice charge), in which he states:  "The [PeopleSoft] system does not automatically include differentials paid to certain employees in calculating the overtime rate."[17]
[18] Ex. 7, McDonough Testimony, LRC Tr./70-71; 72; Ex. 8, McDonough Tr./13.
[19] Ex. 8, McDonough Tr./13-14.

Glora, the City of Boston's Auditor who was in charge of payroll matters, in which he identified a number of issues the implementation of PeopleSoft had caused for the Sheriff's Department.[20]   Several of the bullet points of his letter referred to the failure of PeopleSoft to include differentials in overtime due union employees:

- **Weekend Differentials need to be automatic for hours worked on weekends.**
- **Differentials paid through additional pay need to be automatic for the entire workgroup**. Right now, whenever employees become active on the payroll (end LOA, WC or new hire) they do not receive the differentials,
- Differentials are not paid for personal time taken for employees in Local 419 and Local 3967. Differentials are also not paid when employees swap on for employees in Locals 419, 3967, 1134, 3643, and Jail RN's. I believe this is because personal time is mapped to sick and swap on is mapped to a no-pay status however this is not consistent with the contract and needs to be changed.
- **The method of FSLA overtime rate calculation is not consistent with that used by the SCSD before implementation.** (Emphasis added.)

    13.    Likewise, concerned that the employees were not being paid in accordance with the Fair Labor Standards Act, McDonough contacted the City Treasurer's office, and alerted it to her concerns.[21]   In an email dated March 9, 2000, she sent Denise Jordan of the City a spreadsheet calculating retroactive pay, and commented:

> This is a report that I received to calculate Retro for WG404, 405, 403.  I think it is a good example of the Overtime issue we discussed at the meeting a couple of weeks ago. As you can see for a regular day at one rate, the OT rate for that same person is the regular rate. The far right column states dollar amount paid and it does not reflect a special accumulator. **No differentials or prior 01 is reflected in the actual 01 rate.** This is the case with all workgroups but they were not getting retro so I do not have a report of their time paid. I can get examples for you if you need them.  (Emphasis supplied.)[22]

---

[20] Ex. 12, Yotts memo to Glora, dated January 24, 2000.
[21] Ex. 8, McDonough Tr./13-14.
[22] Ex. 9, McDonough Email to Jordan, dated March 9, 2000.

14.    In March of 2000, McDonough sent a report to Glora, showing her how PeopleSoft failed to factor differentials into overtime payments:

> I think it is a good example of the Overtime issue we discussed at the meeting a couple of weeks ago. As you can see for a regular day at one rate, the OT rate for that same person is the regular rate * 1.5. The far right column states dollar amount paid and it does not reflect a special accumulator. No differentials or prior OT is reflected in the actual OT rate. This is the case with all workgroups but they were not getting retro so I do not have a report of their time paid. I can get examples for you if you need them.[23]

15.    Reflecting her ongoing concern about FLSA violations, approximately 30 days later, McDonough wrote Pat Murphy of the City, and asked her: "Do you have any idea when the Overtime (*sic*) will reflect FLSA?  When weekend differentials will be automatic?"[24]  McDonough sent as many as 25 e-mails to the City in an attempt to resolve the error.[25]

16.    On October 5, 2000, Michael Cawley, the Director of Personnel for the Sheriff's Department, with the assistance of the Assistant Director, McDonough,[26] wrote a memorandum about overtime rate change to Charles Abate, the Department's Employee Relations Director; Yotts;[27] and Ian Gainsford, its Deputy Financial Officer.[28] Given the importance of this Memorandum, it is quoted in its entirety here, with emphasis added in boldface.

> The intent of this memo is to provide you with information regarding overtime calculation so the Department can formalize, with both City Hall and the Unions, our policy on calculating overtime rates. Please find below descriptions of how OT has been

---

[23] Ex. 9, McDonough E-Mail to Jordan, March 9, 2000; Ex. 8, McDonough Tr./23.
[24] Ex. 10, McDonough Email to Murphy, dated April 10, 2000.
[25] Ex. 7, LRC Tr./74;
[26] Ex. 8, McDonough Tr./16.
[27] Ex. 4, Yotts Tr./26.
[28] Ex. 6, Memorandum of Cawley, dated October 3, 2000.

calculated in the past, how we currently calculate OT and recommendations on how we should calculate OT.

FLSA Calculation Prior to PeopleSoft:

Prior to the conversion to PeopleSoft in October of 1999, our payroll data including OT calculation was processed on Dataease. The Personnel Division would send a weekly OT disk up to City Hall, which would include the number of OT hours worked multiplied by the FLSA rate. **The FLSA rate included payments received for regular hours worked and differentials.**

Example 1:     John Smith     40 hrs per week @ $20.00 for a
                              weekly salary of
                              $800.00
                              40 hrs of Night Diff@ $1.00 pr hour
                              $40.00
                              l6 hrs of Weekend Diff @$1.00 pr hr
                              $16.00

                              $856.00

               FLSA Rate   $856.00/40hrs  = $21.40 x 1.5
                              = $32.10

Example 2:     John Smith     Called in sick on one day

                              40 hrs per week @ $20.00 for a
                              weekly salary of
                              $800.00
                              32 hrs of Night Diff @ $1.00 pr hour
                              $32.00
                              16 hrs of Weekend Diff @ $l.00 pr hr
                              $16.00

                              $848.00

               FLSA Rate   $848.00/40 hrs = 21.20 x 1.5
                              = $31.80

Notes:

9

**It should be noted that the intent of the Dataease calculations was to include the amount employees earned in differentials into the OT rate paid.**

It also should be noted that the rate calculated was based on the previous workweek and not the week in which the overtime was worked. **Strict interpretation of the FLSA dictates that these calculations be generated for the week in which the employee works OT.**

It should also be noted that when employees had not worked forty hours, they were still paid at a rate of least 1.5x the regular rate. The FLSA states that until an employee actually works forty hours, he/she should be paid at straight time. (see Example 2 on page 2)

(Emphasis added.)

FLSA Calculation by PeopleSoft, 10/99 to present:

The BAISE project has configured the PeopleSoft System to calculate overtime at 1.5 x the regular hourly rate.

Example 1:    John Smith       40 hrs per week @ $20.00 for a
                                weekly salary of $800.00
                                40 hrs of Night Diff @ $1.00 pr hour
                                $40.00
                                16 hrs of Weekend Diff @ $l.00 pr hr
                                <u>$16.00</u>

                                $856.00

            **FLSA Rate  =  $800.00/40 hrs = 20.00 x 1.5
            = $30.00**

Ms. Sally Glora, City of Boston Auditor and Project Manager of the BAISE Project indicated that the reason the BAISE project does not utilize FLSA calculations is that employees who are paid 1.5x the regular hourly rate are receiving a better rate than if FLSA guidelines are followed. The specific guideline that Ms. Glora is referring to states that until an employee actually works 40 hours, only then are they entitled to hours paid on an overtime rate. (see below example)

Example 2:    John Smith  32 Reg hrs per week @ $20.00 for a

weekly salary of $640.00
        8 Sick hrs (or Vac, Comp & Credit) $160.00

If Mr. Smith works 8 hr OT in this week, he would earn those 8 hrs at the regular rate of $20.00 pr hour because he did not work 40 hours in that week.

**In my opinion, the City of Boston came to the conclusion that employees were most likely being overpaid by using the flat 1.5 rate. The City is willing to overlook that added expense in exchange for not adhering to the extensive guidelines required to fully implement the FLSA. Fully implementing the FLSA guidelines would be an administrative and logistical nightmare for the BAISE project.**

Recommendations

Based on meetings with the BAISE project leaders and as a result of inquiries from AFSCME, I feel as though we have two viable options. **These options are based on the assumption that we are either going to follow the FLSA and all its guidelines or that we are going to follow the CBA`s in reference to "hours of work and overtime" language.** In my opinion we have to educate the unions as to the options available.

Option 1 —Continue to calculate the overtime rate at 1.5x the regular rate. This would benefit both the employees as well as the Department.

Employee Benefits

- The employees would benefit by not having to actually work forty hours in a week in order to earn more than their regular rate of pay for OT hours. For example, an employee could use a "comp taken" day, work overtime and be compensated at the 1.5 rate. Under the FLSA scenario, an employee would take a comp day, work overtime and be compensated at straight time for the OT worked. This would be our strongest argument to the unions for keeping the rate as it is currently calculated.
- The employees would benefit in that they would receive a consistent OT rate as opposed to a different rate each week. This would eliminate confusion.

11

Department Benefits

- The Personnel Division would not have to expend the time and resources of working with the BAISE Project on such a grand undertaking.
- The Department would not be at risk of having to change the OT calculation if and when we are assumed by the state.
- The Department would finally bring closure to the conflicting language between the FLSA and the CBA's.
- The Department would not have to calculate any retroactive OT payments from October 1999. An undesirable result of any retro calculations will most likely bring to light that employees have been overpaid under the FLSA guidelines.

Option 2 —**Follow the strict guidelines of the FLSA in calculating OT rates. Under this scenario, the OT rate would include the regular wages, and all differentials, The wellness money would also have to be included in this rate.**

Employee Benefits

- **Some employees would see an increase in their OT rate as a result of including the various differentials. This would only affect individuals who do not take time off.**

**Department Benefits**

- **The Department would finally be in full compliance with the FLSA**.

- This could lead to a small decrease in the amount of sick time taken. For example if an officer knows that if he calls in sick and works overtime in the same pay period, he/she will only be paid straight time for the OT hour worked.

In conclusion, I feel that the Department's stance should be similar to that of the City of Boston as it relates to the overtime calculation. **We either follow the language of the CBA's and not include differentials in OT calculation, or we implement every aspect of the FLSA including the provision that employees must work forty hours before the FLSA rate takes effect.** I think we have to convey to the unions that at best, with strict

adherence to the FLSA, some of their members may receive additional compensation but many of their members will only receive straight time for overtime worked in a week in which they utilize accrued time. I am also confident that if retroactive payments are required to be processed under the FLSA rules, many employees would owe the Department money.

I realize this is a lot to digest so please call me with any questions or concerns so we may bring this issue to a conclusion.

17.    At his deposition, while referring back to his memorandum, Cawley admitted that he knew the FLSA required differentials to be included in employees' overtime rates of pay.[29]   The memorandum's coauthor, McDonough, admitted this as well.[30]

18.    At her deposition in June of 2007, McDonough testified that the Defendant did not factor the differentials into the Plaintiffs' overtime rate because it would have been administratively onerous to do so.[31]   In her testimony before the Labor Relations Commission in 2001, McDonough stated it would have been possible for the differentials to be included in the calculations of overtime for impacted employees.[32]   For example, the Sheriff's Department could have instructed the City to account for the differentials each employee was entitled to be paid under the collective bargaining

---

[29] Ex. 3 Cawley, Tr./14, line 20-23; Tr./16-17, lines 20-23; 1; Tr./17, lines 18-21; Tr./21, lines 15-23; Tr./22 lines 12-20.

[30] Ex. 8, McDonough Tr./18.

[31] Ex. 8, McDonough Depo. Tr./28.

```
10   Q.  Why didn't -- if you know, why didn't the Sheriff's
11        Department accede to the union's demand that the
12        differentials be put back into the overtime
13        calculations again like they were before the
14        conversion?
15   A.  My understanding is it was impossible -- if not
16        impossible, then extremely, extremely difficult and
17        time-consuming.
```

[32] McDonough Testimony, LRC Tr./78.

13

agreements.[33]  McDonough also testified at the LRC that the Sheriff's Department could have also accounted for the differentials through "time and labor", that is, by recording the differentials to which the employees were entitled on their weekly attendance calendars.[34]

Respectfully submitted,

THE PLAINTIFFS,

By their attorney,

s/Daniel W. Rice
Daniel W. Rice, BBO # 559269
GLYNN, LANDRY,
HARRINGTON & RICE, LLP
10 Forbes Road
Braintree, MA 02184
(781) 849-8479
danielrice@comcast.net

Dated:  November 15, 2007

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on November 15, 2007.

/s/ Daniel W. Rice
Daniel W. Rice

---

[33] McDonough Testimony, LRC Tr./78.
[34] Ex. 7, McDonough Testimony, LRC Tr./78.

14

# EXHIBIT 1A

# A G R E E M E N T

## BETWEEN

## SUFFOLK COUNTY

## AND

## AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES (AFSCME)

## AFL-CIO COUNCIL 93 AND AFFILIATE

## SUFFOLK COUNTY HOUSE OF CORRECTION LOCAL 419

**Effective July 1, 2003**

**Expiring June 30, 2005**

# TABLE OF CONTENTS

| ARTICLE | | |
|---|---|---|
| I | Employees Covered | 1 |
| II | Non-Discrimination | 2 |
| III | Union Dues | 2 |
| IV | Agency Service Fee | 2 |
| V | Management Rights | 3 |
| VI | Discipline and Discharge | 4 |
| VII | Grievance Procedure | 5 |
| VIII | No-Strike Clause | 7 |
| IX | Stability of Agreement | 8 |
| X | Hours of Work and Overtime | 8 |
| XI | Temporary Service | 13 |
| XII | Seniority | 14 |
| XIII | Holidays | 15 |
| XIV | Vacation Leave | 17 |
| XV | Sick Leave | 21 |
| XVI | Other Leaves of Absence | 24 |
| XVII | Health and Safety | 27 |
| XVIII | Miscellaneous | 27 |
| XIX | Compensation | 29 |
| XX | Union Business | 32 |
| XXI | Probation and Promotion | 34 |
| XXII | Drug Testing | 37 |
| XXIII | Investigations | 40 |
| XXIV | Duration of Agreement | 42 |

## AGREEMENT

THIS AGREEMENT, made under Chapter 150E of the General Laws, by and between the Sheriff of Suffolk County, hereinafter called "the Municipal Employer," and Suffolk County, hereinafter called "the County," and the American Federation of State, County and Municipal Employees (AFSCME), AFL-CIO, Council 93 and affiliated Suffolk County House of Correction Local 419, all which, jointly and severally, are hereinafter called "the Union."

## WITNESSETH

WHEREAS the above-cited statutory provisions grant to employees of political subdivisions of the Commonwealth the right to bargain collectively with their Municipal Employer; and

WHEREAS the parties to this Agreement desire to establish a state of amicable understanding, cooperation and harmony; and

WHEREAS the parties to this Agreement consider themselves mutually responsible to improve the public service through the creation of increased morale and efficiency;

NOW, THEREFORE, in consideration of the mutual promises and agreements herein contained, the parties mutually agree as follows:

## ARTICLE I
## EMPLOYEES COVERED BY THIS AGREEMENT

The Municipal Employer recognizes the Union as the exclusive bargaining representative, for the purpose of collective bargaining relative to wages, hours, and other conditions of employment, of all current employees of the Suffolk County House of Correction in the compensation grades CO-1, CO-2, CO-3, and CO-4.

will be discussed at the Labor-Management Committee, and that the current practice of discussing health and safety issues at the committee prior to filing a grievance on same will continue.

**Section 5.** The union agrees to form a committee, along with the Municipal Employer and all other affected locals which choose to participate, the purpose of which is to examine and discuss the implications of a merger between Local 419 of AFSCME, Council 93 and JOEASC, as well as the most efficient means of effectuating the merger.

**Section 6.** The department and the union agree to form a joint committee to explore the issue of "line of duty" pay.

## ARTICLE XIX
## COMPENSATION

**Section 1.** The following wage scale shall govern all employees covered by this collective bargaining agreement:

| GRADE | STEP 1 | STEP 2 | STEP 3 | STEP 4 | STEP 5 | STEP 6 | STEP 7 | STEP 8 | STEP 9 |
|-------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| CO-1 | 566.75 | 647.38 | 732.14 | 782.42 | 845.03 | 861.91 | 879.15 | 896.73 | 914.6 |
| CO-2 | 588.13 | 682.90 | 779.95 | 832.12 | 898.68 | 916.65 | 934.99 | 953.69 | 972.7 |
| CO-3 | 618.81 | 725.91 | 841.33 | 888.40 | 959.47 | 978.67 | 998.24 | 1,018.21 | 1,038.5 |
| CO-4 | 674.48 | 798.54 | 933.31 | 980.34 | 1,058.78 | 1,079.96 | 1,101.56 | 1,123.59 | 1,146.0 |

**Section 2.** Correction officers covered by this Agreement who have ten (10) years of service shall be placed in the maximum of the grade to which they are provisionally, as well as permanently, promoted.

**Section 3.  Educational Incentives.**
**A.  Differential**
Effective July 1, 2000, there shall be an educational incentive differential for those bargaining unit members with degrees from accredited colleges and universities approved by the Sheriff as follows:

1. Associates Degree - $.72/ hour for all regularly-scheduled actual hours worked;

2. Bachelors Degree - $1.20/ hour for all regularly-scheduled actual hours worked;

3. Masters Degree - $1.44/ hour for all regularly-scheduled actual hours worked.

**B. Tuition Remission**

The Municipal Employer shall establish a program for tuition remission in accordance with existing state guidelines.

**Section 4. Mileage.** The mileage allowance shall be thirty-three cents ($.33) per mile.

**Section 5.** All employees shall receive step raises in accordance with the Suffolk County Classification and Compensation Plan of 1963, as amended.

**Section 6. Health Insurance**

A. The Municipal Employer's contribution to all group hospitalization insurance premiums shall be as follows:

    1.   75% of total premium for the indemnity plan selected by the employer, including Master Medical or equivalent coverage;

    2.   90% of the total monthly premium for all approved and authorized health maintenance organizations.

B. Should the county develop an RFP for a policy other than BC/BS Master Medical, it shall meet with the union in advance of the advertisement of said RFP. The meetings shall be for the purpose of soliciting comments and suggestions from the union prior to finalizing the RFP. The union shall be furnished a copy of the finalized RFP.

**Section 7. Financing.**

A. No monies shall be paid under this Article unless and until the funds necessary to implement this Agreement have been appropriated and approved by the County Government Finance Review Board.

B. The provisions of Chapter 190, §18 of the Acts of 1982 are incorporated into this Agreement.

**Section 8. Longevity.** There shall be a program as follows:

A. Employees with five (5) years of service with the Suffolk County House of Correction but less than ten (10) years - $350.00

B. Employees with ten (10) years of service with the Suffolk County House of Correction but less than fifteen (15) years - $500.00

C. Employees with fifteen (15) years of service with the Suffolk County House of Correction but less than twenty (20) - $600.00

D. Employees with twenty (20) years of service with the Suffolk County House of Correction but less than twenty-five (25) - $700.00

E. Employees with twenty-five (25) or more years of service with the Suffolk County House of Correction - $800.00

**Section 9. Weekend Differential.** The weekend differential shall be $1.00 per hour for all regularly-scheduled actual hours worked between the hours of 11:00 PM on Friday and 11:00 PM on Sunday.

**Section 10. Shift Differential.**

A. The shift differential shall be $1.05 per hour for all regularly-scheduled actual hours worked on a night shift.

B. The term "night shift" shall mean a regular work shift four (4) or more hours of which occur between 7:00 PM on one day and 8:00 AM on the next succeeding day.

**Section 11. Public Safety Differential.**

A. The public safety differential shall be $1.30 per hour for employees in grades CO-1, CO-2, and CO-3 for all regularly-scheduled actual hours worked.

B. The public safety differential shall be $1.54 per hour for employees in grade CO-4 only for all regularly-scheduled actual hours worked.

**Section 12. Actual Hours.** The definition of "actual hours worked" shall include all regularly-scheduled hours worked and vacation days.

**Section 13.** The Municipal Employer agrees to contribute at least $ 8.76 weekly to the Massachusetts Public Employees Fund for dental/eyeglass benefits for bargaining unit members.

**Section 14. Fitness Bonus.** Employees who annually meet the requirements of the Municipal Employer's voluntary "Wellness and Fitness" program will receive a cash payment of $ 800.00, payable no later than December 15th each year.

31

# EXHIBIT 1B



EXHIBIT

tabbies*

#12

# A G R E E M E N T

## BETWEEN

## SUFFOLK COUNTY

## AND

## AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES (AFSCME)

## AFL-CIO COUNCIL 93 AND AFFILIATE

## SUFFOLK COUNTY HOUSE OF CORRECTION LOCAL 419

Effective July 1, 1999

Expiring June 30, 2000

**Section 5.** The union agrees to form a committee, along with the Municipal Employer and all other affected locals which choose to participate, the purpose of which is to examine and discuss the implications of a merger between Local 419 and Local 1134, each of AFSCME Council 93, as well as the most efficient means of effectuating the merger.

## ARTICLE XIX
## COMPENSATION

**Section 1A.** Effective June 30, 1999, the following wage scale shall govern all employees covered by this collective bargaining agreement:

| Grade | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 | Step 6 |
|-------|--------|--------|--------|--------|--------|--------|
| CO-1 | $506.01 | $577.99 | $653.67 | $698.57 | $754.45 | $769.53 |
| CO-2 | $525.09 | $609.71 | $696.36 | $742.93 | $802.36 | $818.41 |
| CO-3 | $552.48 | $648.11 | $751.16 | $793.18 | $856.64 | $873.77 |
| CO-4 | $602.19 | $712.95 | $833.28 | $875.27 | $945.30 | $964.21 |

Employees who, as of June 30, 1999, have a minimum of 52 weeks of creditable service at Step 5 shall be placed at Step 6.

**Section 1B.** Effective July 3, 1999, the following wage scale shall govern all employees covered by this collective bargaining agreement:

| Grade | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 | Step 6 |
|-------|--------|--------|--------|--------|--------|--------|
| CO-1 | 521.19 | 595.33 | 673.28 | 719.52 | 777.09 | 792.62 |
| CO-2 | 540.85 | 628.00 | 717.25 | 765.22 | 826.43 | 842.96 |
| CO-3 | 569.06 | 667.55 | 773.69 | 816.98 | 882.33 | 899.99 |
| CO-4 | 620.26 | 734.34 | 858.28 | 901.53 | 973.66 | 993.14 |

**Section 1C.** Effective September 4, 1999, the following wage scale shall govern all employees covered by this collective bargaining agreement:

| Grade | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 | Step 6 | Step 7 |
|-------|--------|--------|--------|--------|--------|--------|--------|
| CO-1 | 521.19 | 595.33 | 673.28 | 719.52 | 777.09 | 792.62 | 808.47 |
| CO-2 | 540.85 | 628.00 | 717.25 | 765.22 | 826.43 | 842.96 | 859.82 |
| CO-3 | 569.06 | 667.55 | 773.69 | 816.98 | 882.33 | 899.99 | 917.99 |
| CO-4 | 620.26 | 734.34 | 858.28 | 901.53 | 973.66 | 993.14 | 1013.00 |

Employees who, as of September 4, 1999, have a minimum of 104 weeks of creditable service at Step 5 and/or Step 6 shall be placed at Step 7.

Section 2.  Correction officers covered by this Agreement who have ten (10) years of service shall be placed in the maximum of the grade to which they are provisionally, as well as permanently, promoted.

Section 3.  **Education Differential.**  Effective July 3, 1999, there shall be an educational incentive differential for those bargaining unit members with degrees in the fields of Criminal Justice or Law Enforcement from an approved college and approved by the Sheriff as follows:

> Associates Degree - $.45/ hour for all regularly scheduled actual hours worked;
> Bachelors Degree - $.60/ hour for all regularly scheduled actual hours worked;
> Masters Degree - $.75/ hour for all regularly scheduled actual hours worked."

Section 4.  **Mileage.**  Mileage allowance shall be thirty-three cents ($.33) per mile.

Section 5.  All employees shall receive step raises in accordance with the Suffolk County Classification and Compensation Plan of 1963, as amended.

Section 6.  **Health Insurance.**

A.  The Municipal Employer's contribution to all group hospitalization insurance premiums shall be as follows:

  1.  75% of total premium for the indemnity plan selected by the employer, including Master Medical or equivalent coverage;

  2.  90% of the total monthly premium for all approved and authorized health maintenance organizations.

B.  Should the county develop an RFP for a policy other than BC/BS Master Medical, it shall meet the union in advance of the advertisement of said RFP.  The meetings shall be for the purpose of soliciting comments and suggestions from the union prior to finalizing the RFP.  The union shall be furnished a copy of the finalized RFP.

C.  The Municipal Employer agrees to contribute at least $8.76 weekly to the Massachusetts Public Employees Fund for dental/eyeglass benefits for bargaining unit members.

Section 7. **Financing.**

A.  No monies shall be paid under this Article unless and until the funds necessary to implement this Agreement have been appropriated and approved by the County Government Finance Review Board.

B.  The provisions of Chapter 190, §18 of the Acts of 1982 are incorporated into this Agreement.

23

**Section 8.  Longevity.**  Effective January 1, 1999, there shall be a program as follows:

A.  Employees with five (5) years of service with the Suffolk County House of Correction but less than fifteen (10) years - $250.00

B.  Employees with ten (10) years of service with the Suffolk County House of Correction but less than fifteen (15) years - $500.00

C.  Employees with fifteen (15) years of service with the Suffolk County House of Correction but less than twenty (20) - $600.00

D.  Employees with twenty (20) years of service with the Suffolk County House of Correction but less than twenty five (25) - $700.00

E.  Employees with twenty five (25) or more years of service with the Suffolk County House of Correction - $800.00

**Section 9. Weekend Differential.**  Effective July 3, 1999 the weekend differential shall be increased to $1.00 per hour for all regularly scheduled actual hours worked between the hours of 11:00 p.m. on Friday and 11:00 p.m. on Sunday.

**Section 10.  Shift Differential.**

A.  Effective July 3, 1999 the shift differential shall be increased to $1.05 per hour for all regularly-scheduled actual hours worked on a night shift.

B.  The term "night shift" shall mean a regular work shift four (4) or more hours of which occur between 7:00 p.m. on one day and 8:00 a.m. on the next succeeding day.

**Section 11.  Public Safety Differential.**

A.  Effective July 3, 1999, the public safety differential shall be increased to $1.01 per hour for employees in grades CO-1, CO-2, and CO-3 for all regularly-scheduled actual hours worked.

B.  Effective July 3, 1999, the public safety differential shall be increased to $1.25 per hour for employees in grade CO-4 only for all regularly-scheduled actual hours worked.

**Section 12.  Actual Hours.**  The definition of "actual hours worked" shall include all regularly-scheduled hours worked and vacation days.

**Section 13.**  The Municipal Employer agrees to contribute at least $ 8.76 weekly to the Massachusetts Public Employees Fund for dental/eyeglass benefits for bargaining unit members.

# EXHIBIT 1C

EXHIBIT

# A G R E E M E N T

## BETWEEN

## SUFFOLK COUNTY

### AND

## AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES (AFSCME)

## AFL-CIO COUNCIL 93 AND AFFILIATE

## SUFFOLK COUNTY HOUSE OF CORRECTION LOCAL 419

Effective July 1, 2000

Expiring June 30, 2003

Council 93, as well as the most efficient means of effectuating the merger.

Section 6. The department and the union agree to form a joint committee to explore the issue of "line of duty" pay.

## ARTICLE XIX
## COMPENSATION

Section 1A. Effective July 1, 2000, the following wage scale shall govern all employees covered by this collective bargaining agreement:

| GRADE | STEP 1 | STEP 2 | STEP 3 | STEP 4 | STEP 5 | STEP 6 | STEP 7 |
|---|---|---|---|---|---|---|---|
| CO-1 | 536.83 | 613.19 | 693.48 | 741.11 | 800.40 | 816.40 | 832.72 |
| CO-2 | 557.08 | 646.84 | 738.77 | 788.18 | 851.22 | 868.25 | 885.61 |
| CO-3 | 586.13 | 687.58 | 796.90 | 841.49 | 908.80 | 926.99 | 945.53 |
| CO-4 | 638.87 | 756.37 | 884.03 | 928.58 | 1,002.87 | 1,022.93 | 1,043.39 |

Section 1B. Effective September 2, 2000, the following wage scale shall govern all employees covered by this collective bargaining agreement:

| GRADE | STEP 1 | STEP 2 | STEP 3 | STEP 4 | STEP 5 | STEP 6 | STEP 7 | STEP 8 |
|---|---|---|---|---|---|---|---|---|
| CO-1 | 536.83 | 613.19 | 693.48 | 741.11 | 800.40 | 816.40 | 832.72 | 849.38 |
| CO-2 | 557.08 | 646.84 | 738.77 | 788.18 | 851.22 | 868.25 | 885.61 | 903.33 |
| CO-3 | 586.13 | 687.58 | 796.90 | 841.49 | 908.80 | 926.99 | 945.53 | 964.44 |
| CO-4 | 638.87 | 756.37 | 884.03 | 928.58 | 1,002.87 | 1,022.93 | 1,043.39 | 1,064.26 |

Employees who, as of September 1, 2000, have a minimum of 52 weeks of creditable service at Step 7 shall be placed at Step 8.

Section 1C. Effective July 7, 2001, the following wage scale shall govern all employees covered by this collective bargaining agreement:

| GRADE | STEP 1 | STEP 2 | STEP 3 | STEP 4 | STEP 5 | STEP 6 | STEP 7 | STEP 8 |
|---|---|---|---|---|---|---|---|---|
| CO-1 | 550.25 | 628.52 | 710.82 | 759.63 | 820.41 | 836.81 | 853.54 | 870.61 |
| CO-2 | 571.00 | 663.01 | 757.24 | 807.88 | 872.50 | 889.96 | 907.75 | 925.91 |
| CO-3 | 600.79 | 704.77 | 816.82 | 862.53 | 931.52 | 950.16 | 969.17 | 988.55 |
| CO-4 | 654.84 | 775.28 | 906.13 | 951.79 | 1,027.94 | 1,048.51 | 1,069.47 | 1,090.86 |

Section 1D. Effective September 1, 2001, the following wage scale shall govern all employees covered by this collective bargaining agreement:

| GRADE | STEP 1 | STEP 2 | STEP 3 | STEP 4 | STEP 5 | STEP 6 | STEP 7 | STEP 8 | STEP 9 |
|-------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| CO-1 | 550.25 | 628.52 | 710.82 | 759.63 | 820.41 | 836.81 | 853.54 | 870.61 | 888.03 |
| CO-2 | 571.00 | 663.01 | 757.24 | 807.88 | 872.50 | 889.96 | 907.75 | 925.91 | 944.43 |
| CO-3 | 600.79 | 704.77 | 816.82 | 862.53 | 931.52 | 950.16 | 969.17 | 988.55 | 1,008.32 |
| CO-4 | 654.84 | 775.28 | 906.13 | 951.79 | 1,027.94 | 1,048.51 | 1,069.47 | 1,090.86 | 1,112.68 |

Employees who, as of August 31, 2000, have a minimum of 52 weeks of creditable service at Step 8 shall be placed at Step 9.

Section 1E. Effective July 6, 2002, the following wage scale shall govern all employees covered by this collective bargaining agreement:

| GRADE | STEP 1 | STEP 2 | STEP 3 | STEP 4 | STEP 5 | STEP 6 | STEP 7 | STEP 8 | STEP 9 |
|-------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| CO-1 | 566.75 | 647.38 | 732.14 | 782.42 | 845.03 | 861.91 | 879.15 | 896.73 | 914.67 |
| CO-2 | 588.13 | 682.90 | 779.95 | 832.12 | 898.68 | 916.65 | 934.99 | 953.69 | 972.76 |
| CO-3 | 618.81 | 725.91 | 841.33 | 888.40 | 959.47 | 978.67 | 998.24 | 1,018.21 | 1,038.57 |
| CO-4 | 674.48 | 798.54 | 933.31 | 980.34 | 1,058.78 | 1,079.96 | 1,101.56 | 1,123.59 | 1,146.06 |

Section 2. Correction officers covered by this Agreement who have ten (10) years of service shall be placed in the maximum of the grade to which they are provisionally, as well as permanently, promoted.

Section 3. Educational Incentives.

A. Differential

Effective July 1, 2000, there shall be an educational incentive differential for those bargaining unit members with degrees from accredited colleges and universities approved by the Sheriff as follows:

1. Associates Degree - $.72/ hour for all regularly-scheduled actual hours worked;

2. Bachelors Degree - $1.20/ hour for all regularly-scheduled actual hours worked;

3. Masters Degree - $1.44/ hour for all regularly-scheduled actual hours worked.

B. Tuition Remission

The Municipal Employer shall establish a program for tuition remission in accordance with existing state guidelines.

**Section 4. Mileage.** Effective July 1, 2000, the mileage allowance shall be thirty-three cents ($.33) per mile.

**Section 5.** All employees shall receive step raises in accordance with the Suffolk County Classification and Compensation Plan of 1963, as amended.

**Section 6. Health Insurance**

A. The Municipal Employer's contribution to all group hospitalization insurance premiums shall be as follows:

    1. 75% of total premium for the indemnity plan selected by the employer, including Master Medical or equivalent coverage;

    2. 90% of the total monthly premium for all approved and authorized health maintenance organizations.

B. Should the county develop an RFP for a policy other than BC/BS Master Medical, it shall meet with the union in advance of the advertisement of said RFP. The meetings shall be for the purpose of soliciting comments and suggestions from the union prior to finalizing the RFP. The union shall be furnished a copy of the finalized RFP.

**Section 7. Financing.**

A. No monies shall be paid under this Article unless and until the funds necessary to implement this Agreement have been appropriated and approved by the County Government Finance Review Board.

B. The provisions of Chapter 190, §18 of the Acts of 1982 are incorporated into this Agreement.

**Section 8. Longevity.** Effective July 1, 2000, there shall be a program as follows:

A. Employees with five (5) years of service with the Suffolk County House of Correction but less than ten (10) years - $350.00

B. Employees with ten (10) years of service with the Suffolk County House of Correction but less than fifteen (15) years - $500.00

C. Employees with fifteen (15) years of service with the Suffolk County House of Correction but less than twenty (20) - $600.00

D. Employees with twenty (20) years of service with the Suffolk County House of Correction but less than twenty-five (25) - $700.00

28

E.  Employees with twenty-five (25) or more years of service with the Suffolk County House of Correction - $800.00

**Section 9. Weekend Differential.**  The weekend differential shall be $1.00 per hour for all regularly-scheduled actual hours worked between the hours of 11:00 PM on Friday and 11:00 PM on Sunday.

**Section 10.  Shift Differential.**

A.  The shift differential shall be $1.05 per hour for all regularly-scheduled actual hours worked on a night shift.

B.  The term "night shift" shall mean a regular work shift four (4) or more hours of which occur between 7:00 PM on one day and 8:00 AM on the next succeeding day.

**Section 11.  Public Safety Differential.**

A.  Effective July 1, 2000, the public safety differential shall be increased to $1.30 per hour for employees in grades CO-1, CO-2, and CO-3 for all regularly-scheduled actual hours worked.

B.  Effective July 1, 2000, the public safety differential shall be increased to $1.54 per hour for employees in grade CO-4 only for all regularly-scheduled actual hours worked.

**Section 12.  Actual Hours.**  The definition of "actual hours worked" shall include all regularly-scheduled hours worked and vacation days.

**Section 13.**  The Municipal Employer agrees to contribute at least $ 8.76 weekly to the Massachusetts Public Employees Fund for dental/eyeglass benefits for bargaining unit members.

**Section 14. Fitness Bonus.**  Employees who annually meet the requirements of the Municipal Employer's voluntary "Wellness and Fitness" program will receive a cash payment of $ 800.00, payable no later than December 15th each year.

# EXHIBIT 1D

# A G R E E M E N T

BETWEEN

SUFFOLK COUNTY

AND

**AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES
(AFSCME)**

**AFL-CIO COUNCIL 93 AND AFFILIATE**

**SUFFOLK COUNTY HOUSE OF CORRECTION
LOCAL 419**

**Effective July 1, 2005**

**Expiring June 30, 2008**



## LOCAL 419 EXECUTIVE BOARD

MICHAEL SIMPSON
President

TROY SALVETTI
Vice President

DENNIS GUILFOYLE
Secretary

SCOTT SMITH
Treasurer

TOM FLYNN

BRIAN AHERN

BRIAN MCPHERSON
(3) Executive Board Members

BRYAN KAISER
Trustee

DAVID KENEALLY
Sergeant Of arms

## LOCAL 419 BARGAINING COMMITTEE

MICHAEL SIMPSON

DENNIS GUILFOYLE

BRYAN KAISER

DAN GRIFFIN

BILL KENNEALLY

**CHIEF STEWARD**

TOM TUCCI
**STEWARD**

JOHN KATIKAKIS

## TABLE OF CONTENTS

| ARTICLE | SUBJECT | Side Letter |
|---|---|---|
| I | Employees Covered | 1 |
| II | Non-Discrimination | 1 |
| III | Union Dues | 1 |
| IV | Agency Service Fee | 2 |
| V | Management Rights | 2 |
| VI | Discipline and Discharge | 3 |
| VII | Grievance Procedure | 3 |
| VIII | No-Strike Clause | 5 |
| IX | Stability of Agreement | 6 |
| X | Hours of Work and Overtime | 6 |
| XI | Temporary Service | 9 |
| XII | Seniority | 10 |
| XIII | Holidays | 11 |
| XIV | Vacation Leave | 12 |
| XV | Sick Leave | 15 |
| XVI | Other Leaves of Absence | 17 |
| XVII | Health and Safety | 19 |
| XVIII | Miscellaneous | 19 |
| XIX | Compensation | 21 |
| XX | Union Business | 25 |
| XXI | Probation and Promotion | 27 |
| XXII | Drug Testing | 28 |
| XXIII | Investigations | 30 |
| XXIV | Duration of Agreement | 32 |

| SUBJECT | Side Letter |
|---|---|
| Side Letter | 34 |
| Performance Evaluation CO-1 & CO-2 | 36 |
| Performance Evaluation CO-3 & CO-4 | 39 |
| Eye & Dental Introduction | 42 |
| Legal Fund Introduction | 43 |
| Grievance Form | 44 |

# AGREEMENT

THIS AGREEMENT, made under Chapter 150E of the General Laws, by and between the Sheriff of Suffolk County, hereinafter called "the Municipal Employer," and Suffolk County, hereinafter called "the County" and the American Federation of State, County and Municipal Employees (AFSCME), AFL-CIO, Council 93 and affiliated Suffolk County House of Correction Local 419, all which, jointly and severally, are hereinafter called "the Union."

## WITNESSETH

WHEREAS the above-cited statutory provisions grant to employees of political subdivisions of the Commonwealth the right to bargain collectively with their Municipal Employer, and

WHEREAS the parties to this Agreement desire to establish a state of amicable understanding, cooperation and harmony, and

WHEREAS the parties to this Agreement consider themselves mutually responsible to improve the public service through the creation of increased morale and efficiency;

NOW, THEREFORE, in consideration of the mutual promises and agreements herein contained, the parties mutually agree as follows:

## ARTICLE I
## EMPLOYEES COVERED BY THIS AGREEMENT

The Municipal Employer recognizes the Union as the exclusive bargaining representative, for the purpose of collective bargaining relative to wages, hours, and other conditions of employment, of all current employees of the Suffolk County House of Correction (SCHC) in the compensation grades CO-1, CO-1N, CO-2, CO-2N, CO-3, CO-3N, CO-4 and CO-4N.

## ARTICLE II
## NON-DISCRIMINATION

The Municipal Employer and the Union agree not to discriminate in any way against employees covered by this Agreement on account of membership or non-membership in the Union, or on account of race, religion, creed, color, national origin, sex, age, or physical handicap. The parties agree that the concept of affirmative action shall be applied consistent with the terms of this Agreement.

## ARTICLE III
## PAYROLL DEDUCTION OF UNION DUES

In accordance with the provision of G.L. c.180, § 17A (Chapter 740 of the Acts of 1950), accepted by the Suffolk County Commissioners on January 15, 1951, union dues shall be deducted weekly from the salary of each employee who executes and remits to the Municipal Employer a form of authorization for payroll deduction of union dues. Remittance of the aggregate amount of dues deducted shall be made to the Union's Treasurer within twenty-five (25) working days after the month in which dues are deducted.

1

agrees to develop and implement, during the life of this agreement, a pilot program for allowing officers assigned to posts within the institutional perimeter to dress in the Class C uniform agreed upon by the parties.

B. Employees hired at any time during the calendar year shall be advanced the allowance payable for such calendar year at time of appointment.

C. Upon termination of an employee due to retirement or death, the allowance payable for that calendar year will be prorated and paid to him/her, or, in case of his/her death, his/her estate, in the manner provided by law for the payment of vacation pay on death or retirement.

**Section 3.** The Municipal Employer shall provide the Union with an updated seniority of all employees covered by this Agreement by January 15th of each calendar year.

**Section 4. Labor-Management Committee.**
A. A Labor-Management Committee shall be established consisting of three (3) representatives of the union and representatives of the Municipal Employer. The representatives of the union and representatives of the Municipal Employer. The committee shall meet at least every other month to discuss matters of mutual concern. The union shall provide the department with the names of its three (3) representatives (each of whom shall attend all meetings to the extent possible) on this committee, in writing, at least two (2) weeks prior to the first meeting. The union agrees that it will not file any charges of a prohibited practice with the Labor Relations Commission until the issue has been raised and discussed with the committee. All requests for release time shall be presented to the Superintendent of Human Resources at least three (3) business days prior to a scheduled meeting.

B. The parties agree that issues currently raised at the Health and Safety Committee will be discussed at the Labor-Management Committee, and that the current practice of discussing health and safety issues at the committee prior to filing a grievance on same will continue.

**Section 5.** The union agrees to form a committee, along with the Municipal Employer and all other affected locals which choose to participate, the purpose of which is to examine and discuss the implications of a merger between Local 419 and Local 1134, each of AFSCME, Council 93, as well as the most efficient means of effectuating the merger.

**Section 6.** The parties and the union agree to form a joint committee to explore the issue of "line of duty" pay.

**Section 7. Performance evaluations.**
A. Effective January 1, 2006 an annual employee performance evaluation system shall be implemented using forms agreed upon between the parties. There shall be a separate form for bargaining unit members in grades CO-1, CO-1N, CO-2 and CO-2N, and a separate form for members in grades CO-3, CO-3N, CO-4, and CO-4N. The initial evaluation period shall be calendar year 2006, provided that all supervisors who are required to perform evaluations have been properly trained on evaluation methods.

B. Performance evaluation forms shall be made available to all employees prior to calendar year 2006. The Superintendent or his designee shall be available at the outset of the implementation of the evaluation process to review criteria with any interested employees.

20

C. All employee performance evaluations shall be completed in writing, and all evaluated employees shall be provided the opportunity to sign and comment upon his/her evaluation prior to its placement in the employee's personnel file.

D. In the event that an employee receives a below expectations rating on any annual evaluation, such employee, upon subsequently receiving three consecutive meets expectations ratings, shall have the below expectations evaluation removed from his/her personnel file. It is understood that disciplinary action shall not be a result of an annual evaluation. It is further understood that evaluations shall be used for assessment in the promotional process as defined in Article XXI, section 6 of this Agreement.

E. It is agreed that there shall be a Performance Evaluation Committee consisting of two (2) representatives of the Union and two (2) representatives of the Department who shall have the option to meet prior to the implementation of the initial evaluation process to consider any mutually agreed upon revisions to the established performance evaluation system. The parties shall also have the option to meet after each subsequent annual evaluation process to mutually agree upon revisions to the established performance evaluation system.

## ARTICLE XIX
## COMPENSATION

**Section 1.**
A. As of July 1, 2005, the following wage scale is in effect:

| | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 | Step 6 | Step 7 | Step 8 | Step 9 |
|---|---|---|---|---|---|---|---|---|---|
| CO-1 | $583.75 | $666.80 | $754.10 | $805.89 | $870.38 | $887.77 | $905.52 | $923.83 | $942.11 |
| CO-2 | $605.77 | $703.39 | $803.35 | $857.08 | $925.64 | $944.15 | $963.04 | $982.30 | $1001.94 |
| CO-3 | $637.37 | $747.69 | $866.57 | $915.05 | $988.25 | $1008.03 | $1028.19 | $1048.76 | $1069.73 |
| CO-4 | $694.71 | $822.50 | $961.31 | $1009.75 | $1090.54 | $1112.36 | $1134.61 | $1157.30 | $1180.44 |

B. Effective October 1, 2005, the wage scale shall be as follows:

| | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 | Step 6 | Step 7 | Step 8 | Step 9 |
|---|---|---|---|---|---|---|---|---|---|
| CO-1 | $648.47 | $733.18 | $822.23 | $875.05 | $940.83 | $968.56 | $976.67 | $995.14 | $1013.99 |
| CO-2 | $670.93 | $770.49 | $872.46 | $927.27 | $997.19 | $1016.07 | $1035.34 | $1054.99 | $1075.02 |
| CO-3 | $703.16 | $815.58 | $936.94 | $986.39 | $1061.06 | $1081.23 | $1101.79 | $1122.77 | $1144.16 |
| CO-4 | $771.44 | $901.76 | $1043.37 | $1092.78 | $1175.19 | $1197.44 | $1220.13 | $1243.28 | $1266.88 |

| | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 |
|---|---|---|---|---|---|
| CO-1N | $690.47 | $775.18 | $864.23 | $917.05 | $982.83 |
| CO-2N | $712.93 | $812.49 | $914.46 | $969.27 | $1039.19 |
| CO-3N | $745.16 | $857.68 | $978.94 | $1028.39 | $1103.06 |
| CO-4N | $813.44 | $943.78 | $1085.37 | $1134.76 | $1217.19 |

21

**Section 8. Longevity.** There shall be a program as follows:

A. Employees with five (5) years of service with the Suffolk County House of Correction but less than ten (10) years - $350.00

B. Employees with ten (10) years of service with the Suffolk County House of Correction but less than fifteen (15) years - $500.00

C. Employees with fifteen (15) years of service with the Suffolk County House of Correction but less than twenty (20) - $600.00

D. Employees with twenty (20) years of service with the Suffolk County House of Correction but less than twenty-five (25) - $700.00

E. Employees with twenty-five (25) or more years of service with the Suffolk County House of Correction - $800.00

**Section 9. Weekend Differential.** The weekend differential shall be $1.00 per hour for all regularly-scheduled actual hours worked between the hours of 11:00 PM on Friday and 11:00 PM on Sunday.

**Section 10. Shift Differential.**

A. The shift differential shall be $1.05 per hour for all regularly-scheduled actual hours worked on a night shift.

B. The term "night shift" shall mean a regular work shift four (4) or more hours of which occur between 7:00 PM on one day and 8:00 AM on the next succeeding day.

C. Effective October 1, 2005, this differential shall be eliminated and included in the regular weekly salary of all employees in grades CO-1N, CO-2N, CO-3N and CO-4N scheduled to work the 2:45 - 11:15 PM and 10:45 PM - 7:15 AM shifts.

**Section 11. Public Safety Differential.**

A. The public safety differential shall be $1.30 per hour for employees in grades CO-1, CO-2, and CO-3 for all regularly-scheduled actual hours worked.

B. The public safety differential shall be $1.54 per hour for employees in grade CO-4 only for all regularly-scheduled actual hours worked.

C. Effective October 1, 2005, these differentials shall be included in the regular weekly salary and eliminated.

**Section 12. Actual Hours.** The definition of "actual hours worked" shall include all regularly-scheduled hours worked and vacation days.

**Section 13.** The Municipal Employer agrees to contribute at least $ 8.76 weekly to the Massachusetts Public Employees Fund for dental/eyeglass benefits for bargaining unit members.

**Section 14. Fitness Bonus.** Employees who annually meet the requirements of the Municipal Employer's voluntary "Wellness and Fitness" program will receive a cash payment $ 800.00, payable no later than December 15th each year.

24

## ARTICLE XX
## UNION BUSINESS

**Section 1. Union Representatives.**

A. The Union shall furnish the Office of Employee Relations with a list of officials and the capacity in which they serve.

B. The Union shall furnish the Office of Employee Relations with the name of the Union steward and alternate for each shift.

C. Lists shall be furnished to the Office of Employee Relations as soon as practicable after designation and the Union shall as soon as practicable notify the Office of Employee Relations of any changes.

**Section 2. Paid Leave of Absence for Union Business.** Release time for Union business shall only be considered for the following reasons:

A. One authorized Union representative, as defined in section 1 above, shall be permitted reasonable time off without loss of pay to represent:

1. Employees upon their request at interviews which may lead to disciplinary action on the premises of the Suffolk County House of Correction, and/or

2. Grievants at a hearing on the premises of the institution or at a Step 2, arbitration, Labor Relations Commission, Civil Service Commission or Massachusetts Commission Against Discrimination hearing.

3. Requests for such time off shall be made in writing at least twenty-four (24) hours in advance to the Superintendent/ designee indicating the date, time and destination;

B. Time-off without loss of pay may be granted for up to five (5) Union members for the purpose of a negotiating committee attending negotiation sessions with the department.

1. Prior to the first collective bargaining session, the Union shall furnish the Office of Employee Relations with the names of the negotiating committee members.

2. Requests for such leave shall be made in writing at least twenty-four (24) hours in advance to the Superintendent/designee.

C. Attendance by employees who are either authorized delegates or alternates at the annual convention of the Massachusetts State Labor Council, the American Federation of State, County and Municipal Employees, AFL-CIO, or the annual convention or conference of the Council 93, AFSCME, AFL-CIO or the AFSCME International Conventions. A list of authorized delegates shall be forwarded by AFSCME to the Office of Employee Relations as far in advance of the date of the convention(s) as possible;

D. Witnesses and/or grievants called by the Union to testify only during their regularly scheduled shift at a Step 2 hearing, an arbitration, Labor Relations Commission, Civil Service Commission hearing or Massachusetts Commission Against Discrimination investigation and/or hearing may be granted time off without loss of pay and without loss of benefits. Requests for such leave shall be made in writing at least twenty-four (24) hours in advance to the Superintendent/designee.

E. Operating Needs.

1. The Sheriff shall be the sole judge in determining whether release time requested under this Article may have an adverse affect on the operations of the Suffolk County House of Correction.

25

# ARTICLE XXIV
## DURATION OF AGREEMENT

**Section 1.** Except as otherwise provided herein, this Agreement shall take effect **of the** date of execution and shall continue in force to and including midnight on June 30, **200**8, but in no event thereafter.

**Section 2.** On or after March 15, 2008, the Union or the Sheriff may notify the **other** of the terms and provisions it desires in a successor Agreement. The parties shall pro-**ceed forthwith** to negotiate with respect thereto. Notification under this Section shall be **accomplished** by the Union delivering a copy of its proposals to the Superintendent of **Human** Resources, or vice versa.

**Section 3.** In the event that during the term of this agreement the Suffolk County **Sheriff** enters into a collective bargaining agreement with another Department bargaining **unit** which includes provisions for monetary increases, the parties agree that related **provisions** of this Agreement can be re-opened for further bargaining.

Signed this 23rd day of February, 2006.

**FOR THE COUNTY**

Andrea J. Gabriel
Sheriff
Suffolk County

Elizabeth Keeley
Chief of Staff

Gerard J. Horgan
Superintendent, House of Correction

Michele Gibbons
Office of Employee Relations

**APPROVED AS TO FORM**

Charles J. Altieri
Senior Legal Advisor, Human Resources

**FOR THE UNION**

Michael Sheldon
President, Local 419

Bryan Kilian
Vice-President, Local 419

Michael J. Harris
Superintendent, Human Resources

James Breslin
AFSCME, Council 93

**BARGAINING COMMITTEE**

Dennis Guilbault

Daniel Griffin

William Kennedy

32

33

# EXHIBIT 2A



EXHIBIT
JA #10

# AGREEMENT

# BETWEEN

# SUFFOLK COUNTY

# AND

# AFSCME, COUNCIL 93

# LOCALS 3643 and 3967

Effective: July 1, 2000

Expires: June 30, 2003

| ARTICLE | TABLE OF CONTENTS | PAGE |
|---|---|---|
| I | Covered Employees | 2 |
| II | Non-Discrimination | 2 |
| III | Union Dues | 2 |
| IV | Agency Service Fee | 3 |
| V | Management Rights | 3 |
| VI | Discipline and Discharge | 4 |
| VII | Grievance Procedure | 4 |
| VIII | No-Strike Clause | 7 |
| IX | Stability of Agreement | 7 |
| X | Hours of Work and Overtime | 8 |
| XI | Temporary Service | 9 |
| XII | Seniority | 9 |
| XIII | Holidays | 11 |
| XIV | Vacation Leave | 12 |
| XV | Sick Leave | 15 |
| XVI | Other Leaves of Absence | 18 |
| XVII | Health and Safety | 20 |
| XVIII | Miscellaneous | 21 |
| XIX | Compensation | 23 |
| XX | Promotion | 26 |
| XXI | Drug Testing | 28 |
| XXII | Duration of Agreement | 30 |

## ARTICLE I
## EMPLOYEES COVERED BY THIS AGREEMENT

The Municipal Employer recognizes the Union as the exclusive representative, for the purpose of collective bgaining relative to wages, hours, and other conditions of employment, of all employees in the services of the Suffolk County Jail and/or House of Correction in the compensation grades JO-4, JO-5 and CO-5.

## ARTICLE II
## NON-DISCRIMINATION

Section 1.  The Municipal Employer and the Union agree not to discriminate in any way against employees covered by this Agreement on account of membership or non-membership in the Union, union activity, or on account of race, religion, creed, color, national origin, sex, age, physical or mental handicap, sexual preference, parental status, or marital status.

Section 2.  The parties agree that the Municipal Employer will not discriminate in any way against employees on account of political activity or lack thereof.  The parties further agree that grievances filed pursuant to this section will be arbitrable notwithstanding the provisions of Article VI.

## ARTICLE III
## PAYROLL DEDUCTION OF UNION DUES

In accordance with the provisions of G.L. c.180, §17A (Chapter 740 of the Acts of 1950), accepted by the County Commissioners on January 15, 1951, union dues shall be deducted weekly from the salary of each employee who executes and remits to the Municipal Employer a form of authorization for payroll deduction of union dues.  Remittance of the aggregate amount of dues deducted shall be made to the Union's Treasurer within twenty-five (25) working days after the month in which dues are deducted.

2

# ARTICLE XIX

## COMPENSATION

### Section 1.   Pay scales.

A.  Effective July 1, 2000, annual base salary rates shall be as follows:

| GRADE | STEP 1 | STEP 2 | STEP 3 | STEP 4 | STEP 5 | STEP 6 | STEP 7 |
|-------|--------|--------|--------|--------|--------|--------|--------|
| JO-4  | $ 638.87 | $ 756.37 | $ 884.03 | $ 928.58 | $1,002.87 | $1,022.93 | $1,043.39 |
| JO-5  | $ 691.96 | $ 825.79 | $ 971.71 | $1,016.27 | $1,097.57 | $1,119.52 | $1,141.91 |
| CO-5  | $ 691.96 | $ 825.79 | $ 971.71 | $1,016.27 | $1,097.57 | $1,119.52 | $1,141.91 |

B.  Effective September 2, 2000, the annual base salary rates shall be as follows, and employees who, as of September 2, 2000, have a minimum of 52 weeks of creditable service at Step 7 shall be placed at Step 8:

| GRADE | STEP 1 | STEP 2 | STEP 3 | STEP 4 | STEP 5 | STEP 6 | STEP 7 | STEP 8 |
|-------|--------|--------|--------|--------|--------|--------|--------|--------|
| JO-4  | $ 638.87 | $ 756.37 | $ 884.03 | $ 928.58 | $1,002.87 | $1,022.93 | $1,043.39 | $ 1,064.26 |
| JO-5  | $ 691.96 | $ 825.79 | $ 971.71 | $1,016.27 | $1,097.57 | $1,119.52 | $1,141.91 | $ 1,164.75 |
| CO-5  | $ 691.96 | $ 825.79 | $ 971.71 | $1,016.27 | $1,097.57 | $1,119.52 | $1,141.91 | $ 1,164.75 |

C.  Effective July 7, 2001, annual base salary rates shall be as follows:

| GRADE | STEP 1 | STEP 2 | STEP 3 | STEP 4 | STEP 5 | STEP 6 | STEP 7 | STEP 8 |
|-------|--------|--------|--------|--------|--------|--------|--------|--------|
| JO-4  | $ 654.84 | $ 775.28 | $ 906.13 | $ 951.79 | $1,027.94 | $1,048.51 | $1,069.47 | $ 1,090.86 |
| JO-5  | $ 709.26 | $ 846.44 | $ 996.01 | $1,041.68 | $1,125.01 | $1,147.51 | $1,170.46 | $ 1,193.87 |
| CO-5  | $ 709.26 | $ 846.44 | $ 996.01 | $1,041.68 | $1,125.01 | $1,147.51 | $1,170.46 | $ 1,193.87 |

D.  Effective September 1, 2001, annual base salary rates shall be as follows, and employees who, as of September 1, 2001, have a minimum of 52 weeks of creditable service at Step 8 shall be placed at Step 9:

| GRADE | STEP 1 | STEP 2 | STEP 3 | STEP 4 | STEP 5 | STEP 6 | STEP 7 | STEP 8 | STEP 9 |
|-------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| JO-4  | $ 654.84 | $ 775.28 | $ 906.13 | $ 951.79 | $1,027.94 | $1,048.51 | $1,069.47 | $ 1,090.86 | $1,112.68 |
| JO-5  | $ 709.26 | $ 846.44 | $ 996.01 | $1,041.68 | $1,125.01 | $1,147.51 | $1,170.46 | $ 1,193.87 | $1,217.74 |
| CO-5  | $ 709.26 | $ 846.44 | $ 996.01 | $1,041.68 | $1,125.01 | $1,147.51 | $1,170.46 | $ 1,193.87 | $1,217.74 |

E.  Effective July 6, 2002, annual base salary rates shall be as follows:

| GRADE | STEP 1 | STEP 2 | STEP 3 | STEP 4 | STEP 5 | STEP 6 | STEP 7 | STEP 8 | STEP 9 |
|-------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| JO-4 | $ 674.48 | $ 798.54 | $ 933.31 | $ 980.34 | $1,058.78 | $1,079.96 | $1,101.56 | $ 1,123.59 | $1,146.06 |
| JO-5 | $ 730.54 | $ 871.83 | $1,025.89 | $1,072.93 | $1,158.76 | $1,181.93 | $1,205.57 | $ 1,229.68 | $1,254.28 |
| CO-5 | $ 730.54 | $ 871.83 | $1,025.89 | $1,072.93 | $1,158.76 | $1,181.93 | $1,205.57 | $ 1,229.68 | $1,254.28 |

Section 2.  Officers covered by this Agreement who have ten (10) years of service shall be placed in the maximum of the grade to which they are permanently promoted.

Section 3.  Mileage allowance shall be thirty-three cents (.33) per mile.

Section 4.  After completion of each year of service in the grade for which he/she is hired or to which he/she is promoted, employees will automatically advance to the next highest step in said pay grade.

Section 5.
A.  The County's contribution to group hospitalization premiums shall be:
1.  75% of total monthly premiums for the indemnity plan selected by the employer, including Master medical or equivalent coverage;
2.  90% of the total monthly premium for all approved and authorized health maintenance organizations.

B.  Should the county develop an RFP for an indemnity plan other than BC/BS Master Medical, it shall meet with the union in advance of the advertisement of said RFP.  The meetings shall be for the purpose of soliciting comments and suggestions from the union prior to finalizing the RFP.  The union shall be furnished a copy of the finalized RFP.

Section 6. Financing.
A.  No moneys shall be paid under this Article unless and until the funds necessary to implement this Agreement have been appropriated by the County Government Finance Review Board.

B.  The provisions of Chapter 190, §18 of the Acts of 1982, are incorporated into this Agreement.

Section 7.  Longevity.

The longevity program shall be as follows:

A.  Employees with five (5) years of service with the Suffolk County Jail or House of Correction but less than ten (10) years - $364.00.

B.  Employees with ten (10) years of service with the Suffolk County Jail or House of Correction but less than fifteen (15) years - $520.00.

C.  Employees with fifteen (15) years of service with the Suffolk County Jail or House of Correction but less than twenty (20) years - $728.00.

D.  Employees with twenty (20) years of service with the Suffolk County Jail or House of Correction but less than twenty five (25) years -$884.00.

E.  Employees with twenty-five (25) or more years of service with the Suffolk County Jail or House of Correction - $1040.00.

F.  Such payment shall be made to employees on the anniversary dates of their employment with the Suffolk County Jail or House of Correction.

Section 8. Weekend Differential.  There shall be a weekend differential of $1.00 for all regularly-scheduled hours actually worked between the hours of 12:00 midnight on Friday and 12:00 midnight on Sunday.

Section 9. Shift Differential.

A.  There shall be a shift differential of $1.05 for all regularly scheduled hours actually worked on a night shift.

B.  The term "night shift" shall mean a regular work shift four or more hours of which occur between 6:00 p.m. one day and 8:00 a.m. on the next succeeding day.

Section 10. Supervisory Differentials.

A.  Shift Commander.  There shall be a $1.00 differential paid to shift commanders for all regularly-scheduled hours actually worked.

B.  Department Head.  There shall be a $0.15 differential paid to department heads for all regularly-scheduled hours actually worked.

C.  Consistent with the current practice, the Sheriff shall retain the absolute unfettered discretion to select the shift commander and department heads.

Section 11. Public Safety Differential. In addition to any other regular or premium compensation to which employees are entitled, all members of the bargaining unit shall receive a public safety differential in the amount of $1.54 per regularly-scheduled hour actually worked.

Section 12.  Educational Differential.  Effective July 1, 2000, there shall be an educational incentive differential for those bargaining unit members with degrees from accredited colleges and universities approved by the Sheriff as follows:

A.  Associates Degree - $.72/ hour for all regularly-scheduled actual hours worked

B.  Bachelors Degree - $1.20/ hour for all regularly-scheduled actual hours worked

C.  Masters Degree - $1.44/ hour for all regularly-scheduled actual hours worked

Section 13. For purposes of sections 8, 9, 10, 11, and 12 of this Article and section 3 of Article XVIII of this agreement, the term "actual work" shall include all regularly-scheduled hours worked and vacation days.

Section 14. Dental/Vision Care.   The present level of dental/eyeglass benefits will be maintained for bargaining unit members.

Section 15.  Fitness Bonus.

A.  Employees who annually meet the requirements of the Municipal Employer's voluntary "Wellness and Fitness" program will receive a cash payment of $ 800.00, payable no later than December 15th each year.

B.  Requests for alternative fitness requirements for medical reasons will be given fair consideration on an individual basis.

Section 16.  Tuition Remission.  The Municipal Employer shall establish a program for tuition remission in accordance with existing state guidelines.

## ARTICLE XX

## PROBATION AND PROMOTION

Section 1.  For all employees hired after the effective date of this agreement, the regular probationary period shall be one year of active service from the date of appointment by the Municipal Employer.

# EXHIBIT 2B

# AGREEMENT

# BETWEEN

## SUFFOLK  COUNTY

## AND

## AFSCME, COUNCIL 93

## LOCAL 3643

## SUFFOLK COUNTY JAIL EMPLOYEES

Effective: July 1, 1998

Expires: June 30, 2000

ARTICLE XIX.

COMPENSATION

<u>Section 1.</u> (A) Effective July 1, 1998, annual base salary rates shall be as follows:

| Grade | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 |
|-------|--------|--------|--------|--------|--------|
| JO-4 | $602.19 | $712.96 | $833.28 | $875.27 | $945.30 |
| JO-5 | $652.25 | $778.39 | $915.93 | $957.93 | $1034.56 |

(B)  Effective September 2, 1998, the annual base salary rates shall be as follows, and employees who, as of September 2, 1998, have a minimum of 52 weeks of creditable service at Step 5 shall be placed at Step 6:

| Grade | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 | Step 6 |
|-------|--------|--------|--------|--------|--------|--------|
| JO-4 | $602.19 | $712.95 | $834.21 | $875.27 | $945.30 | $964.21 |
| JO-5 | $652.25 | $778.39 | $915.93 | $957.93 | $1034.56 | $1055.25 |

C)  Effective July 3, 1999, annual base salary rates shall be as follows:

| Grade | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 | Step 6 |
|-------|--------|--------|--------|--------|--------|--------|
| JO-4 | $620.26 | $734.34 | $858.28 | $901.53 | $973.66 | $993.14 |
| JO-5 | $671.81 | $801.74 | $943.41 | $986.67 | $1065.60 | $1086.91 |

(D)  Effective September 4, 1999, annual base salary rates shall be as follows, and employees who, as of September 4, 1999, have a minimum of 52 weeks of creditable service at Step 6 shall be placed at Step 7:

| Grade | Step 1 | Step 2 | Step 3 | Step 4 | Step 5 | Step 6 | Step 7 |
|-------|--------|--------|--------|--------|--------|--------|--------|
| JO-4 | $620.26 | $734.34 | $858.28 | $901.53 | $973.66 | $993.14 | $1013.00 |
| JO-5 | $671.81 | $801.74 | $943.41 | $986.67 | $1065.60 | $1086.91 | $1108.65 |

Page 33 of 40

Section 2. Every employee holding a position classified in a grade with the prefix "JO" shall, upon completion of each year of service in the position, be advanced to the rate specified for the grade of the position in the next numerically numbered column, if any, for said grade.

Section 3. Jail Officers covered by this Agreement who have ten (10) years of service shall be placed in the maximum of the grade to which they are provisionally, as well as permanently, promoted.

Section 4. Mileage allowance shall be thirty cents (.30) per mile.

Section 5. An employee with not less than one year of service who is not a permanent employee shall be advanced to the step next higher in his pay grade, and thereafter shall automatically advance to the next higher step, if any, unless he fails a Civil Service examination or fails to take a scheduled Civil Service examination without reasonable cause.  An employee who on January 1, 1978 has less than one year of service or who is hired thereafter shall receive step-rates under this provision, except that his anniversary date shall be date of hire.

Section 6. The County's contribution to group hospitalization premiums shall be:

a)    75% of total monthly premiums for the indemnity plan selected by the employer, including Master medical or equivalent coverage;

(b)    90% of the total monthly premium for all approved and authorized health maintenance organizations.

Should the county develop an RFP for an indemnity plan other than BC/BS Master Medical, it shall meet with the union in advance of the advertisement of said RFP. The meetings shall be for the purpose of soliciting comments and suggestions from the union prior to finalizing the RFP. The union shall be furnished a copy of the finalized RFP.

Section 7. Financing.

(a) No moneys shall be paid under this Article unless and until the funds necessary to implement this Agreement have been appropriated by the County Government Finance Review Board.

(b) The provisions of Chapter 190, §18 of the Acts of 1982, are incorporated into this Agreement.

Section 8. Longevity.

Effective January 1, 1999, the longevity program shall be as follows:

(a) employees with five (5) years of service with the Suffolk County Sheriff's Department but less than ten (10) years - $300.00.

(b) Employees with ten (10) years of service with the Suffolk County Sheriff's Department but less than fifteen (15) years - $500.00.

(c) Employees with fifteen (15) years of service with the Suffolk County Sheriff's Department but less than twenty (20) years - $700.00.

(d) Employees with twenty (20) years of service with the Suffolk County Sheriff's Department but less than twenty five (25) years -$850.00.

(e) Employees with twenty-five (25) or more years of service with the Suffolk County Sheriff's Department - $1000.00.

Such payment shall be made to employees on the anniversary dates of their employment with the Suffolk County Jail.

Section 9. Weekend Differential. Effective July 3, 1999, there shall be a weekend differential of $1.06 for all regularly scheduled hours actually worked between the hours of 12:00 midnight on Friday and 12:00 midnight on Sunday.

Section 10. Shift Differential. Effective July 3, 1999, there shall be a shift differential of $1.11 for all regularly scheduled hours actually worked on a night shift. The term "night shift" shall mean a regular work shift four or more hours of which occur between 6:00 p.m. one day and 8:00 a.m. on the next succeeding day.

Section 11. Supervisory Differentials.

(a) Shift Commander Differential. There shall be a $1.00 differential paid to shift commanders for all regularly-scheduled hours actually worked.

(b) Department Head Differential. There shall be a $0.15 differential paid to department heads for all regularly-scheduled hours actually worked.

(c) Consistent with the current practice the Sheriff shall retain the absolute unfettered discretion to select the shift commander and department heads. .

Section 12. Public Safety Differential. Effective July 3, 1999, in addition to any other regular or premium compensation to which employees are entitled, all members of the bargaining unit shall receive a public safety differential in the amount of $1.33 per regularly scheduled hour actually worked.

Section 13.  Educational Differential.  Effective July 3, 1999, there shall be an educational incentive differential for those bargaining unit members with documented degrees in the fields of Criminal Justice or Law Enforcement from a mutually-agreed upon list of colleges and universities as follows:

    (a)  Associates Degree - $.45/ hour for all regularly-scheduled actual hours worked

    (b)  Bachelors Degree - $.60/ hour for all regularly-scheduled actual hours worked

    (c)  Masters Degree - $.75/ hour for all regularly-scheduled actual hours worked

Section 14. For purposes of sections 9, 10, 11, 13 and 14 of this Article and section 4 of Article XVIII of this agreement, the term "actual work" shall include all regularly- scheduled hours worked and vacation days.

Section 15. Dental/Vision Care.   The present level of dental/eyeglass benefits will be maintained for bargaining unit members.

## ARTICLE XX.

## PROBATION AND PROMOTION

Section 1.  For all employees hired after the effective date of this agreement, the regular probationary period shall be one year of active service from the date of appointment by the Municipal Employer.

Section 2.  Notice of promotional vacancy in a position covered by this agreement shall be posted for a period of ten (10) consecutive days.  Any employee who is eligible, pursuant to Section 3 of this Article, and interested in filling the vacancy shall apply therefor to the Sheriff through the Director of Personnel.

# EXHIBIT 3

MAROTTA

VERSUS

SUFFOLK COUNTY

TRANSCRIPT AND WORD INDEX FOR THE DEPOSITION OF:

MICHAEL CAWLEY

THURSDAY, JUNE 7, 2007

Leavitt Reporting, Inc.

1207 Commercial Street Rear

Weymouth, MA 02189

Telephone(781)335-6791 Fax(781)335-7911

Leavittreporting@att.net

**Page 1**

VOLUME:      1
PAGES:       1 - 31
EXHIBITS:  None

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * *

GIUSEPPE MAROTTA, et al,
          Plaintiffs,
                              CA# 05-10032-MEL
vs.

SUFFOLK COUNTY,
          Defendant.

* * * * * * * * * * * *

DEPOSITION OF MICHAEL CAWLEY, a witness
called on behalf of the Plaintiffs, pursuant to
Massachusetts Rules of Civil Procedure, before
Carolyn McGill, a Shorthand Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Law Offices of Glynn, Landry, Harrington and
Rice, LLP, 10 Forbes Road, Braintree, Massachusetts
on Thursday, June 7, 2007 commencing at 10:00 a.m.

LEAVITT REPORTING, INC.

**Page 3**

                                    I N D E X

DEPONENT                                    PAGE

Michael Cawley

Examination by Mr. Rice              4

LEAVITT REPORTING, INC.

**Page 2**

## APPEARANCES

GLYNN, LANDRY, HARRINGTON AND RICE, LLP
   (By Daniel W. Rice, Esq.)
   10 Forbes Road,
   Braintree, Ma 02184,
   On behalf of the Plaintiffs.


SHERIFF'S DEPARTMENT,
   (By Russell Homsy, Esq.)
   20 Bradston Street,
   Boston, MA 02118,
   On behalf of the Defendant.

LEAVITT REPORTING, INC.

**Page 4**

P-R-O-C-E-E-D-I-N-G-S

STIPULATIONS
     It was stipulated and agreed by
and between counsel for the respective parties
that the witness will read and sign the
deposition transcript within thirty days of
receipt of the transcript.  And the sealing,
filing and certification thereof are waived.
     It was further stipulated and
agreed that all objections, except as to the
form of the question, shall be reserved until
the time of trial.

     **Michael Cawley,** having been
satisfactorily identified by the production of
his driver's license and duly sworn by the
Notary Public, called on behalf of the
Plaintiffs, on oath deposes and says as follows:

     MR. HOMSY:  For the record, I
represent Michael Cawley.  You can have the depo
sent to me and I will send it to him to read,

LEAVITT REPORTING, INC.

**5**

1  sign, waive notary. Can we have thirty days for
2  that? Is that okay?
3      MR. RICE: Well, for signing
4  that's not a problem. We're running into some
5  deadlines here --
6      (Discussion off the record).
7  **Examination by Mr. Rice:**
8    Q. Could you state your name please?
9    A. Michael Cawley.
10   Q. Mr. Cawley, at some point were you
11 employed by the Suffolk County Sherif's
12 Department?
13   A. Yes, I was.
14   Q. When were you employed there?
15   A. 1989 to 2001.
16   Q. What jobs did you have with the
17 Sheriff's Department?
18   A. I started as a Senior Administrative
19 Assistant in the Budget Department and I was
20 Assistant Director of Personnel and then
21 Director of Personnel.
22   Q. When were you the Director of
23 Personnel?
    LEAVITT REPORTING, INC.

**6**

1    A. From 1997 to 2001.
2    Q. Are you familiar with the federal law
3  known as the Fair Labor Standards Act?
4    A. Yes.
5    Q. Have you received any training in the
6  Fair Labor Standards Act?
7    A. I believe I have, yes.
8    Q. Had you received that before you were
9  working in Personnel at the Sheriff's
10 Department?
11   A. Actually, I think I may have attended
12 a seminar on it after the Sheriff's Department.
13   Q. Were you involved in payroll issues
14 when you were working for the Sheriff's
15 Department?
16   A. Yes, I was.
17   Q. What was your involvement with payroll
18 issues?
19   A. As the Director of Personnel we had
20 responsibility for implementing and processing
21 the payroll on a weekly basis. I had an
22 Assistant Director report into me who was
23 primarily responsible for the payroll.
    LEAVITT REPORTING, INC.

**7**

1    Q. Now, the City of Boston played some
2  role in the payroll for Suffolk Sheriff's
3  Department employees?
4    A. Sure.
5    Q. What role did it play?
6    A. We actually submitted the payroll to
7  the City of Boston and it may have been the
8  Auditing Department, I'm not exactly sure which
9  department, and they would actually generate the
10 paychecks. And we would go to City Hall and
11 pick up the paychecks and bring them back to the
12 Sheriff's Department.
13   Q. Did the Sheriff's Department utilize
14 software?
15   A. Yes, we did.
16   Q. What was the software that you used?
17   A. PeopleSoft.
18   Q. PeopleSoft wasn't always in use at the
19 Sheriff's Department, was it?
20   A. No. We implemented PeopleSoft in 2000
21 I believe.
22   Q. Was it the Sheriff's Department that
23 implemented that or was it the City?
    LEAVITT REPORTING, INC.

**8**

1    A. It was both actually. It was a city
2  wide initiative and the Sheriff's Department was
3  required to participate being part of the City.
4    Q. What role did you play if any in the
5  implementation of PeopleSoft?
6    A. I attended meetings with the City of
7  Boston. It was called the BAISE Project so I
8  attended meetings. We supplied data regarding
9  payroll issues, contracts and things of that
10 nature just to get the payroll rules squared
11 away.
12   Q. Some of the employees who work for the
13 Sheriff's Department are unionized?
14   A. That's correct.
15   Q. While you were the Director of
16 Personnel were the corrections officers
17 unionized?
18   A. Yes, they were.
19   Q. Do you remember what the local unions
20 were and who they represented?
21   A. I know that Local 419 was the House of
22 Correction officers and Local 1134 I believe was
23 the jail officers.
    LEAVITT REPORTING, INC.

Case 1:05-cv-10188-WGY    Document 21-8    Filed 11/15/2007    Page 5 of 10

1  Q.  How about superior officers?

2  A.  I know they were represented.  The

3  Lieutenants and the Captains had a separate

4  union.  I don't recall the number of the union.

5  Q.  Did each of these unions have

6  collective bargaining agreements with the

7  Sheriff's Department?

8  A.  Yes, they did.

9  Q.  In these collective bargaining

10  agreements were wages addressed?

11  A.  Yes.

12  Q.  Are you familiar with the term

13  differentials?

14  A.  Yes.

15  Q.  As they relate to the collective

16  bargaining agreement and wages are you familiar

17  with that?

18  A.  Yes.

19  Q.  What are the differentials?

20  A.  The differentials were part of the

21  contract for hours actually worked by the

22  correction officers.  So uniform differential

23  for example, and I believe it was the based on

LEAVITT REPORTING, INC.

---

1  calculated into overtime payments for Sheriff's

2  Department employees change?

3  A.  I don't think so.  I don't know if --

4  if the differentials --  I'm not sure if the

5  differentials were actually implemented in the

6  first contract, if they were prior to the actual

7  paper payroll that we used to do.

8  MR. RICE:  If you don't object do

9  you want to just use the Yotts exhibit?

10  MR. HOMSY:  Yeah, why don't we.

11  Q.  I'm going to give you a few minutes to

12  read this over.

13  MR. RICE:  Just for the record,

14  I'm going to identify it as Exhibit Three from

15  Mr. Yotts' deposition yesterday.

16  A.  Okay.  Bringing back a lot of

17  memories.

18  Q.  First of all, this is a memo to --

19  it's in the top section which is to Charles

20  Abate, Employee Relations from Michael J.

21  Cawley, Director of Personnel.  Do you see where

22  it says that?

23  A.  Yes.

LEAVITT REPORTING, INC.

---

1  hours actually worked, I'm not a hundred percent

2  certain, so if an officer worked X number of

3  hours in the week they'd receive a uniform

4  differential for each of those hours worked.

5  Q.  There was a differential for example

6  for public safety?

7  A.  I don't recall that one but I know

8  there was an overnight differential.  I remember

9  the uniform differential but I don't remember --

10  I don't recall the public safety one.

11  Q.  Educational incentives, were there

12  differentials for those?

13  A.  You know, I'm not really sure if there

14  were for education.  I thought we had a -- I

15  can't remember.  I know there was something

16  going on with the education but I'm not sure if

17  it was in the format of differentials.

18  Q.  Now, you testified earlier that

19  PeopleSoft was implemented while you were the

20  Director of Personnel?

21  A.  Yes.

22  Q.  After PeopleSoft was implemented did

23  the manner in which differentials were

LEAVITT REPORTING, INC.

---

1  Q.  Do you recognize this memo?

2  A.  Yes.

3  Q.  Did you write it?

4  A.  I did.

5  Q.  The date is October 5, 2000?

6  A.  Sounds right.

7  Q.  Do you remember writing this memo?

8  A.  Yes.

9  Q.  In writing this memo did you review

10  any sources or reference books?

11  A.  I would imagine that I did.  I don't

12  know exactly if I did.

13  Q.  As the Director of Personnel working

14  at the Sheriff's Department did you have a

15  library of some kind dealing with federal and

16  state employment laws?

17  A.  Yes.

18  Q.  And you had access to it?

19  A.  I did.

20  Q.  In this memo there are references,

21  would you agree, to requirements of the Fair

22  Labor Standards Act?

23  A.  Yes.

LEAVITT REPORTING, INC.

---

13

1    Q.  And do you recall looking at any
2    reference materials of any kind that were
3    available to you to glean the legal standards
4    that are in this memo?
5        A.  I don't recall.  It was eight years
6    ago, seven years ago.  I don't recall
7    specifically looking at it but I would imagine
8    that I would.  On the bottom paragraph on the
9    first page it says FLSA states that until an
10   employee.  So I would imagine that I referenced
11   some material.
12           MR. HOMSY:  Don't guess on your
13   answer.  He doesn't want you to guess.
14       Q.  Did you, while you were the Director
15   of Personnel, did you write any other memos
16   about the Fair Labor Standards Act?
17       A.  Not that I know of.
18       Q.  Do you know what it was that
19   occasioned you to write this memo?
20       A.  I would imagine the issue that the
21   memo talks about, the calculation of overtime
22   regarding PeopleSoft.
23       Q.  Does the memo refresh your memory as
                LEAVITT REPORTING, INC.

14

1    to whether or not there was a controversy in or
2    around October of 2000 about how overtime rates
3    were being calculated for Sheriff's Department
4    employees after the conversion to PeopleSoft?
5        A.  Yeah, I think there were some concerns
6    regarding some of the union members that brought
7    it to our attention.
8        Q.  What were those concerns?
9        A.  That the overtime calculations were
10   incorrect.
11       Q.  Are you familiar with the term
12   overtime rate of pay?
13       A.  Yes.
14       Q.  As you sit here today and maybe having
15   looked at this memo, what do you understand that
16   to be, overtime rate of pay?
17       A.  Overtime rate of pay is the rate of
18   pay paid to employees who work in excess of
19   forty hours a week.
20       Q.  Under the Fair Labor Standards Act is
21   the overtime rate of pay supposed to include
22   wage differentials?
23       A.  I believe so, yes.
                LEAVITT REPORTING, INC.

15

1    Q.  Prior to the conversion to PeopleSoft
2    were those wage differentials included in other
3    overtime payments?
4        A.  Yes, they were.
5        Q.  After the conversion to PeopleSoft
6    were the wage differentials included in the
7    calculation of overtime?
8        A.  I do not believe so.
9        Q.  Do you know why that was the case?
10       A.  From my understanding it was a
11   decision made by the BAISE Project managers if
12   you will.
13       Q.  You can clear up a huge issue in this
14   case if you can tell us what BAISE stands for?
15       A.  I can't.  Boston Administrative
16   Information Systems something.  I forget to be
17   honest with you.
18       Q.  So what is your understanding as to
19   how BAISE --
20       A.  This is my understanding.  We
21   submitted the payroll to the City of Boston.
22   The City of Boston was implementing the city
23   wide BAISE Project implementing PeopleSoft in
                LEAVITT REPORTING, INC.

16

1    the year 2000.
2            So we had meetings with
3    representatives of the City of Boston as did
4    every city department and provided them with the
5    bargaining unit contracts and the pay rules for
6    each of those.  And then the programmers were
7    implementing or programing the calculations
8    necessary to properly pay the various employees.
9        Q.  Was it your opinion at the time that
10   you wrote this memo that the payment of overtime
11   without including differentials after the
12   implementation of PeopleSoft was a violation of
13   the Fair Labor Standards Act?
14       A.  I don't know if I'd consider it a
15   violation of the Fair Labor Standards Act.  It
16   was more of a change in policy or our behalf and
17   I just wanted to get some clarification and
18   knowledge out to the folks involved as to what
19   we were actually doing.
20       Q.  Well, it's your testimony that the
21   Fair Labor Standards Act requires wage
22   differentials to be included in overtime
23   payments?
                LEAVITT REPORTING, INC.

**17**

1   A.   Correct.
2   Q.   And are you aware of any provisions of
3   the Fair Labor Standards Act now, or actually
4   let's ask this question.
5        At the time you wrote this memo
6   were you aware of any provision under the Fair
7   Labor Standards Act that would have excepted the
8   Sheriff's Department from including wage
9   differentials in the payment of overtime?
10   A.   That would have excepted the fact that
11   the Sheriff's Department is excluding
12   differential in the overtime?
13   Q.   Yeah.  It would have made it all right
14   not to include the wage differentials in the
15   overtime pay?
16   A.   There was nothing I was aware of that
17   would allow that.
18   Q.   But you were aware of a provision that
19   required it to do so?
20   A.   It was my understanding that the FLSA
21   did require it to do so, yes.
22   Q.   Now, in the second full paragraph of
23   the memo you use the term FLSA rate, correct?

LEAVITT REPORTING, INC.

**18**

1   A.   Yes.
2   Q.   That's referring to the practice of
3   paying overtime before the conversion to
4   PeopleSoft in October of 1999?
5   A.   Yeah.  The FLSA rate was the same
6   before and after the PeopleSoft.  The definition
7   is the same.
8   Q.   From this paragraph was it the case
9   that the Sheriff's Department would provide the
10   FLSA rate of the employees who worked for it on
11   an overtime disk and send it to City Hall?
12   A.   Yes.
13   Q.   Did that change after the conversion
14   to PeopleSoft, that practice of sending the rate
15   on the OT disk?
16   A.   Yes, it did.
17   Q.   How did it change?
18   A.   There was no longer a disk to be sent
19   up to City Hall because the calculations were
20   completed by PeopleSoft.
21   Q.   Prior to the conversion how was the
22   FLSA rate determined?
23   A.   The software that we had which was

LEAVITT REPORTING, INC.

**19**

1   DataEase which I had forgotten about until I
2   read this memo, calculated the overtime rate
3   based on the differentials that were paid for
4   the particular week in question.
5   Q.   And in your notes section on this
6   first page you stated in writing back in October
7   of 2000 what you just stated?
8   A.   Yes.
9   Q.   It should be noted that the intent of
10   Dataease calculations was to include the amount
11   employees earned in differentials into the OT
12   rate paid?
13   A.   Yes.
14   Q.   That was meant to comply with the Fair
15   Labor Standards Act?
16   A.   Correct.
17   Q.   Now, on the second page in the second
18   section in the last paragraph starting with the
19   phrase in my opinion --
20   A.   Uh-huh.
21   Q.   You state that in my opinion the City
22   of Boston came to the conclusion that employees
23   were most likely being over paid by using the

LEAVITT REPORTING, INC.

**20**

1   flat 1.5 rate.  The City is willing to overlook
2   that added expense in exchange for not adhering
3   to the extensive guidelines to fully implement
4   FLSA.  Fully implementing the FLSA guidelines
5   would be an administrative and logistical
6   nightmare for the BAISE Project.  I read that
7   accurately, right?
8   A.   Yes.
9   Q.   What was your opinion as set forth in
10   that paragraph based on?
11   A.   It was just conversations that I had
12   with people within the BAISE Project.
13   Q.   Now, do you know as you sit here today
14   whether or not the City changed the way that it
15   was calculating overtime payments?
16   A.   I don't.  I recall there was a suit
17   filed against the City but I don't know what the
18   result was.
19   Q.   Is it your understanding that that
20   suit related to a violation of the Fair Labor
21   Standards Act in not including the differentials
22   in the overtime payments?
23   A.   It's just based on conversations that

LEAVITT REPORTING, INC.

21

1  I have had since I left the Department with
2  folks that it was just based on the FLSA
3  calculation.
4      Q.  Now on the third page starting
5  where -- I'm referring to where it says Option
6  2.
7      A.  Uh-huh.
8      Q.  It states; follow the strict
9  guidelines of the FLSA in calculating OT rates.
10  Under this scenario, the OT rate would include
11  the regular wages and all differentials.  The
12  wellness money would also have to be included in
13  this rate.  And you wrote that?
14      A.  Yes.
15      Q.  Were you stating there that you
16  understood that the Fair Labor Standards Act
17  required that the overtime rates of the
18  employees include their wage differentials?
19      A.  Yes.
20      Q.  At the time you wrote that memo were
21  you under the impression that there was some
22  distinction between strict guidelines of the
23  FLSA and something along the lines of permissive
LEAVITT REPORTING, INC.

22

1  guidelines?
2      A.  I'm not really sure to be honest with
3  you what my thinking was regarding that
4  terminology.
5      Q.  Is it fair to say that what you're
6  stating here, even with the modifier strict
7  guidelines, is actually what the Fair Labor
8  Standards Act provides with respect to
9  calculating overtime rates that they must
10  include wage differentials?
11      A.  What's the question?
12      Q.  I'm sorry.  Is it fair to say in
13  writing the first sentence in the paragraph,
14  we're referring to Option 2, that you wrote this
15  understanding that the Fair Labor Standards Act
16  required differentials to be included in the
17  calculation of overtime rates?
18      A.  Is it fair to say that it was my
19  understanding that the FLSA required the
20  differentials?  Yes.
21      Q.  Now, you submitted this memo to Mr.
22  Abate, Mr. Yotts and Mr. Gaisford?
23      A.  Yes.
LEAVITT REPORTING, INC.

23

1      Q.  Should that be Gainsford?
2      A.  No, it's Gaisford.
3      Q.  Did you have conversation with any of
4  those individuals after you submitted the memo
5  about it?
6      A.  I am sure I did.
7      Q.  Did you have any conversations with
8  any representatives of the union about the
9  non-inclusion we'll call it of the differentials
10  in the overtime rate after you wrote this memo?
11      A.  To be honest with you I'm not too
12  sure.
13      Q.  Do you have any recollection of the
14  union filing a prohibited practice charge with
15  the Labor Relations Commission alleging that the
16  City had violated the state's public employee
17  collective bargaining law by not including the
18  differentials in their overtime rates?
19      A.  I don't remember that specifically.  I
20  honestly don't remember if that occurred while I
21  was still there or after I had left.
22      Q.  I'm sorry.  I forget when you left.
23      A.  2001.  January of 2001.
LEAVITT REPORTING, INC.

24

1      Q.  Now, prior to the time you left is it
2  fair to say that the Sheriff's Department did
3  not include the differentials when coming up
4  with the overtime rates of pay for the Sheriff's
5  Department employees?
6      A.  Under PeopleSoft, yes.
7      Q.  Who decided not to if you know?
8      A.  Again, it's my understanding that it
9  was the BAISE Project and people that developed
10  the programs that made that decision.
11      Q.  What's your understanding based on?
12      A.  It's because we provided the BAISE
13  Project with the contracts and the wage
14  information and differential information.  And
15  in their calculating or their programing the
16  PeopleSoft payroll software, for whatever
17  reason, they did not calculate or they did not
18  allow the system to calculate the differentials
19  into the overtime calculation.
20      Q.  Did it ever occur to you during the
21  time you were considering this issue that both
22  the Sheriff's Department and employees might be
23  better off if the Fair Labor Standards Act
LEAVITT REPORTING, INC.

**25**

1  requirement that differentials be included in
2  considering and coming up with an employee's
3  overtime rate was not followed?
4      A.  Did it ever -- I'm sorry.
5      Q.  Well, did it ever occur to you that it
6  might be preferable not to include the wage
7  differentials in the overtime rate?
8      A.  Preferable in what sense?
9      Q.  Again, let's turn to your memo.
10     A.  Yeah.
11     Q.  You give recommendations in the memo,
12 right?
13     A.  Yes.
14     Q.  And your first one is entitled Option
15 1.  That's on the second page.
16     A.  Uh-huh.
17     Q.  And the bullet point or after Option 1
18 it states continue to calculate the overtime
19 rate at 1.5 times the regular rate.  That would
20 benefit both the employees as well as the
21 department.  It does say that, correct?
22     A.  Yeah.  Where is that?
23     Q.  I'm sorry.  It's on the second page
                    LEAVITT REPORTING, INC.

**26**

1  right there.
2      A.  Okay.
3      Q.  First of all, before we get into the
4  questions, does this refresh your memory as to
5  what the overtime payments to Sheriff's
6  Department employees were being based on at the
7  time you wrote the memo?
8      A.  Yes.
9      Q.  It was based on their regular rate of
10 pay, right?
11     A.  Yes.
12     Q.  And by regular rate of pay what you
13 mean there is their base pay not including any
14 wage differentials that might have been required
15 by the various collective bargaining agreements?
16     A.  Yes.
17     Q.  Now, in your recommendations, your
18 first recommendation as I just read was to
19 continue to pay employees overtime based on
20 their regular rate of pay without considering
21 the differentials, correct?
22     A.  Correct.
23     Q.  Then you state your rationale for the
                    LEAVITT REPORTING, INC.

**27**

1  employees' benefit and the Department's benefit
2  for continuing to do it that way?
3      A.  Uh-huh.
4      Q.  Without going through what you espouse
5  in your memo here, did you have conversations in
6  which you further elaborated on your belief of
7  these benefits with members of the Department?
8      A.  I am sure I had conversations
9  regarding them but I don't specifically remember
10 any particular conversation.
11     Q.  Did anybody who worked for the
12 Department ever tell you that it had opted to go
13 along with your recommendation set forth under
14 Option 1 in your memo?
15     A.  I don't remember.  I'm totally being
16 honest.  I don't remember somebody saying this
17 is what we're going to do going forward.  I'm
18 assuming somebody would have told me that.  But
19 I honestly don't remember any particular
20 conversation regarding that.
21     Q.  In fact, while you were there and
22 after you wrote the memo, the Department did
23 continue to calculate the overtime rate at one
                    LEAVITT REPORTING, INC.

**28**

1  and a half times the regular rate, correct?
2      A.  Correct.
3          MR. HOMSY:  When you're saying
4  department you mean the Sheriff's Department?
5          MR. RICE:  Sheriff's Department.
6      A.  Yes.
7      Q.  The Sheriff's Department continued to
8  do that, correct?
9      A.  They did, yes.
10     Q.  Were you involved yourself in any
11 attempt to get the union to agree to go along
12 with Option 1?
13     A.  I don't believe so.  I don't recall if
14 I was to be honest with you.  My interaction
15 with the union was somewhat limited because they
16 dealt with Employee Relations.
17     Q.  Turning to Option 2, you state as one
18 of the benefits that the Department would
19 finally be in full compliance with the FLSA?
20     A.  Yes.
21         MR. RICE:  I think I might be done
22 here.
23     Q.  Were you ever involved in any attempt
                    LEAVITT REPORTING, INC.

29

1   to have the City of Boston adjust PeopleSoft so
2   that the wage differentials would be included in
3   the overtime rate?
4       A.   You know, I recall having
5   conversations with people with the City of
6   Boston but I don't know -- I'm not sure if it
7   was handled -- I think that's something that
8   Tom Yotts would have had the conversation with
9   because he was on the same level with Sally
10  Glora I believe who was there at the time.
11      Q.   Do you know someone named Maura
12  McDonough?
13      A.   Yes, I do.
14      Q.   Do you know where she's employed now?
15      A.   Comcast.
16      Q.   Do you know where she lives?
17      A.   I believe Charlestown.
18      Q.   In the time you were the Director of
19  Personnel did she work for you?
20      A.   Yes, she did.
21      Q.   Was she the Assistant Director of
22  Personnel?
23      A.   Yes.
            LEAVITT REPORTING, INC.

30

1       Q.   Did you delegate duties to her related
2   to this PeopleSoft conversion issue and the
3   differentials?
4       A.   Yes, I did.
5       Q.   Do you know whether or not she
6   corresponded with the City about the issue?
7       A.   I don't know for a fact.
8           MR. RICE:  I have no further
9   questions for you.  Thank you.
10          MR. HOMSY:  I don't have any.
11          (The deposition was concluded at
12  10:33 a.m.)
13
14
15
16
17
18
19
20
21
22
23
            LEAVITT REPORTING, INC.

31

1   C E R T I F I C A T E
2
3
4   STATE OF MASSACHUSETTS
5   COUNTY OF PLYMOUTH
6
7       I, Carolyn McGill, a Notary Public in
8   and for the State of Massachusetts, do hereby
9   certify that the foregoing transcript of the
10  deposition of Michael Cawley, having been
11  satisfactorily identified and duly sworn by the
12  Notary Public, on Thursday, June 7, 2007, is
13  true and accurate to the best of my knowledge,
14  skill and ability.
15      IN WITNESS WHEREOF, I have hereunto set
16  my hand and seal this 7th day of June, 2007.
17
18      _____
19          Carolyn McGill
20
21  My commission expires:
22  April 21, 2011
23
            LEAVITT REPORTING, INC.

# EXHIBIT 4

MARROTTA

VERSUS

SUFFOLK COUNTY

TRANSCRIPT AND WORD INDEX FOR THE DEPOSITION OF:

THOMAS YOTTS

WEDNESDAY, JUNE 6, 2007

Leavitt Reporting, Inc.

1207 Commercial Street Rear

Weymouth, MA 02189

Telephone(781)335-6791 Fax(781)335-7911

Leavittreporting@att.net,

```
VOLUME:    1
PAGES:    1 - 43
EXHIBITS:  1 - 3
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * *

GIUSEPPE MAROTTA, et al,
        Plaintiffs,

                    CA# 05-10032-MEL
vs.

SUFFOLK COUNTY,
        Defendant.

* * * * * * * * * * * *

        DEPOSITION OF THOMAS E. YOTTS, a witness
called on behalf of the Plaintiffs, pursuant to
Massachusetts Rules of Civil Procedure, before
Carolyn McGill, a Shorthand Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Law Offices of Glynn, Landry, Harrington and
Rice, LLP, 10 Forbes Road, Braintree, Massachusetts
on Wednesday, June 6, 2007 commencing at 10:05 a.m.

---

**3**

I N D E X

DEPONENT                                PAGE

Thomas Yotts

Examination by Mr. Rice          5
Examination by Mr. Homsy        35

E X H I B I T S

NO. DESCRIPTION                         PAGE

1  Affidavit of Thomas Yotts       16
2  1/24/00 Memorandum to Sally       19
   Glora from Thomas Yotts
3  10/5/00 Memorandum to Charles     25
   Abate from Michael Cawley

LEAVITT REPORTING, INC.

---

**2**

## APPEARANCES

GLYNN, LANDRY, HARRINGTON AND RICE, LLP
   (By Daniel W. Rice, Esq.)
   10 Forbes Road,
   Braintree, Ma 02184,
   On behalf of the Plaintiffs.


SHERIFF'S DEPARTMENT,
   (By Russell Homsy, Esq.)
   20 Bradston Street,
   Boston, MA 02118,
   On behalf of the Defendant.

LEAVITT REPORTING, INC.

---

**4**

P-R-O-C-E-E-D-I-N-G-S
      STIPULATIONS
      It was stipulated and agreed by
and between counsel for the respective parties
that the witness will read and sign the
deposition transcript within fourteen days of
receipt of the transcript.  And the sealing,
filing and certification thereof are waived.
      It was further stipulated and
agreed that all objections, except as to the
form of the question, shall be reserved until
the time of trial.

      **Thomas Yotts,** having been
satisfactorily identified by the production of
his driver's license and duly sworn by the
Notary Public, called on behalf of the
Plaintiffs, on oath deposes and says as follows:
      MR. RICE:  Mr. Yotts, I can send
you a copy of the deposition and it will have
what's known as an errata sheet with it where
you can make corrections to your testimony if
for some reason you disagree with how it was
LEAVITT REPORTING, INC.

5

1  transcribed.
2      THE WITNESS:  Okay.
3      MR. RICE:  And can we use the
4  address that we used for this subpoena for that?
5      THE WITNESS:  Yes.
6      MR. RICE:  Would fourteen days be
7  enough for you to be able to sign it?
8      THE WITNESS:  Yes.
9      MR. RICE:  It that okay with you?
10      MR. HOMSY:  That's fine with me.
11  **Examination by Mr. Rice:**
12      Q.  **Can** you state your full name for the
13  record please?
14      A.  Thomas Yotts.
15      Q.  Where do you reside, Mr. Yotts?
16      A.  95 Freeman Street, Quincy.
17      Q.  At some point in your life were you
18  employed by the Suffolk County Sheriff's
19  Department?
20      A.  Yes.
21      Q.  What were the dates of your
22  employment?
23      A.  From 1980 to 2005.
LEAVITT REPORTING, INC.

6

1      Q.  What jobs did you have for the
2  Sheriff's Department?
3      A.  The last job that I had was Chief
4  Financial Officer which was probably for ten,
5  the last ten or fifteen years.
6      Q.  Before that?
7      A.  Director of Administrative Services,
8  Budget Director, Budget Analyst.
9      Q.  And you were the Chief -- that's Chief
10  Financial Officer?
11      A.  Yes.
12      Q.  Were you the Chief Financial Officer
13  on or after January 1, 1998?
14      A.  I believe so.
15      Q.  Do you remember the date that you
16  started or about when as Chief Financial
17  Officer?
18      A.  As Chief Financial Officer no, not
19  exactly, but -- no.
20      Q.  With respect to payroll issues for
21  individuals who worked for the Sheriff's
22  Department, what role did you play as the Chief
23  Financial Officer?
LEAVITT REPORTING, INC.

7

1      A.  I had the Director of Personnel
2  reporting to me.  So if there were issues that
3  were unable to be resolved at lower levels they
4  would have to come to me for a determination.
5      Q.  While you were the Chief Financial
6  Officer who were the Directors of Personnel?  If
7  you can in giving your answer identify them
8  chronologically?
9      A.  Chronologically?
10      Q.  Like who was first?  When you first
11  started who was the Director of Personnel?
12      A.  I think Anne Ryan.  Are you talking
13  all the way back to 1980?
14      Q.  How about just when you were Chief
15  Financial Officer?
16      A.  How about reverse?
17      Q.  Reverse is fine.
18      A.  When I left it was Mike Harris.  Prior
19  to Mike was Richard Trafalia.  Prior to that,
20  Maura McDonough.
21      Q.  How about an individual named Michael
22  J. Cawley?
23      A.  Yeah, Michael Cawley before Maura
LEAVITT REPORTING, INC.

8

1  McDonough.
2      Q.  With respect to employees' wages, as
3  the Chief Financial Officer did you formulate
4  policy with respect to how wages were paid to
5  employees?
6      A.  Well, there was union contracts.  It's
7  a unionized environment so there are certain
8  aspects of the policies; practices that are
9  bound by the union contracts.  And anything that
10  wasn't covered by union contracts or federal or
11  state law I would have input into certainly.
12      Q.  Have you ever heard of a software
13  program called PeopleSoft?
14      A.  Yes.
15      Q.  To your understanding what is
16  PeopleSoft?
17      A.  It's a software package that has an
18  aspect of recording financial data and it also
19  has an aspect of recording personnel, human
20  resource data.
21      Q.  Did the Suffolk County Sheriff's
22  Department use the PeopleSoft software or was it
23  utilized in paying wages to the employees of the
LEAVITT REPORTING, INC.

1  Suffolk County Sheriff's Department while you
2  were the Chief Financial Officer?
3      A.  Yes.
4      Q.  But that wasn't always the case?
5      A.  Correct.
6      Q.  There was a conversion over to
7  PeopleSoft at some point?
8      A.  Correct.
9      Q.  Do you recall about when that
10  occurred?
11      A.  No.
12      Q.  If I suggested to you that the
13  conversion took place in October of 1999 would
14  that seem correct?
15      A.  Could be.  I couldn't say for sure.
16      Q.  Were you -- I'm sorry.
17      A.  I wouldn't be able to dispute that.
18      Q.  Were you as the Chief Financial
19  Officer involved in converting the Suffolk
20  County Sheriff's Department payroll over to the
21  PeopleSoft system?
22      A.  The conversion actually occurred
23  because the City of Boston converted to
                LEAVITT REPORTING, INC.

1  Department do to facilitate that?
2      A.  We'd have to input information into
3  the PeopleSoft system.
4      Q.  Prior to the conversion to PeopleSoft
5  was that also the case?
6      A.  It would be done manually on sheets,
7  data processing sheets, payroll sheets that they
8  would send down to us and they would key
9  information in.
10      Q.  The City would send you sort of
11  ledgers or something like that?
12      A.  Payroll sheets; names, hours, salary
13  and we would make adjustments to them.
14      Q.  Who would actually do the entering the
15  data onto the sheets that you were given by the
16  City?
17      A.  Someone in our Personnel Department.
18  It could be a number of people.
19      Q.  Did the individuals who'd do that, did
20  they do that with respect to or by looking at
21  the collective bargaining agreements?
22      A.  No.  They would probably not.  They
23  would probably take information and enter it in.
                LEAVITT REPORTING, INC.

1  PeopleSoft and they handled -- our information
2  was sent to the City of Boston.  And paychecks
3  actually came out of the City of Boston's
4  Treasury Department.  So in a sense we were --
5  we had really no choice but to move to the
6  PeopleSoft system for both HR and financial
7  data.
8      Q.  Do you know why it was the case --
9  first of all let me ask you this.  During the
10  time you were the Chief Financial Officer was
11  that always the case that the City of Boston
12  processed paychecks for employees of the
13  Sheriff's Department?
14      A.  Yes.
15      Q.  Do you know why that was the case?
16      A.  I assume it's because the County
17  Treasurer is the -- I mean the City Treasurer is
18  also the County Treasurer and the Sheriff's
19  Department is a county agency.
20      Q.  While you were the Chief Financial
21  Officer in order for the City to cut the
22  paychecks for Suffolk County Sheriff's
23  Department employees what did the Sheriff's
                LEAVITT REPORTING, INC.

1  If there was an issue that was raised, a
2  question regarding how a situation needed to be
3  handled then they would go to a supervisor and
4  right up the ladder to the point of getting the
5  issue resolved?
6      Q.  Once the individuals in the Sheriff's
7  Department recorded the data then it was
8  physically given to the City of Boston?
9      A.  Correct.
10      Q.  And then the employees were paid?
11      A.  Then at some point later on the
12  employees would be paid.
13      Q.  And that practice changed with the
14  conversion over to PeopleSoft?
15      A.  Correct.
16      Q.  How did it change?
17      A.  We were given direct access via
18  computer to the PeopleSoft system so that we
19  could key information directly into computers at
20  the Sheriff's Department into the PeopleSoft
21  system.  That would then result in checks being
22  generated from the City Treasurer's Office.
23      Q.  Well, to your knowledge did the data
                LEAVITT REPORTING, INC.

13

1  that was entered or keyed into the PeopleSoft
2  system differ from the data that had been
3  transmitted with hard copies over to the City?
4      A.  I couldn't say for sure but if so I
5  wouldn't think it would be that much different.
6      Q.  After the City converted to PeopleSoft
7  did you become aware that there had been a
8  change in the payment of overtime to employees
9  of the Suffolk County Sheriff's Department?
10     A.  I think there were -- I think I
11 recall some actions were brought regarding that.
12     Q.  Well, specifically do you recall --
13 first of all, there are unionized employees who
14 work for the Suffolk County Sheriff's
15 Department?
16     A.  Correct.
17     Q.  And the corrections officers are
18 unionized?
19     A.  Correct.
20     Q.  And at the Suffolk County House of
21 Correction is the labor organization that
22 represents the corrections officers known as
23 Local 419?
                LEAVITT REPORTING, INC.

14

1      A.  Yes, that's one.
2      Q.  There's another union that represents
3  corrections officers as well?
4      A.  Yes, there are.  At that time there
5  were four I think.
6      Q.  Do you remember what they were?
7      A.  419.  There was a Local 3967 which is
8  the House of Corrections and then two at the
9  jail which is also under the control of the
10 Sheriff, 1134 and 3643 I think.
11     Q.  Each of those bargaining units had
12 collective bargaining agreements with the
13 Sheriff's Department?
14     A.  Correct.
15     Q.  Within those collective bargaining
16 agreements the subject of wages was addressed?
17     A.  To some degree.
18     Q.  Do you recall that there were certain
19 differentials negotiated between the Sheriff's
20 Department and the unions for the payment of
21 wages for different things?
22     A.  Yes.
23     Q.  What were some of those things?
                LEAVITT REPORTING, INC.

15

1      A.  Night differential, weekend
2  differential, public safety differential,
3  depending on the unit there may be educational
4  differential.  Probably there were some more.
5      Q.  The differentials, do they augment the
6  hourly wage that the employees are entitled to
7  receive if they qualify for the differential, is
8  that how it works?
9      A.  Yes.
10     Q.  Now, prior to the conversion to
11 PeopleSoft were those differentials to your
12 knowledge considered in calculating the overtime
13 for which employees were paid?
14     A.  I think so.
15     Q.  Now after the conversion to PeopleSoft
16 did that change?
17     A.  I don't recall for sure.
18     Q.  Okay.  Are you aware that at some
19 point after the conversion to PeopleSoft the
20 union representing -- or that the Local 419
21 union filed a charge with the Massachusetts
22 Labor Relations Commission alleging that the
23 practice by which they were paid overtime had
                LEAVITT REPORTING, INC.

16

1  changed with the conversion to PeopleSoft?
2      A.  I remember there were some actions
3  regarding the conversion.  What specifically
4  they were I don't recall.
5      Q.  Do you have any recollection of
6  writing and signing an Affidavit with respect to
7  that prohibitive practice charge?
8      A.  Would I be able to look at it?
9      Q.  Yeah.  Do you remember?  I have to ask
10 you that.
11     A.  I don't recall.
12             (Exhibit No. 1 marked for
13 identification).
14     Q.  Why don't you just take a few minutes
15 to look that over?
16     A.  Sure.  Okay.
17     Q.  Now, having looked this over do you
18 remember signing this Affidavit?
19     A.  This is my signature.  I don't
20 remember signing it but I definitely did sign
21 it.
22     Q.  And does it refresh your memory as to
23 whether or not the Union had made a charge
                LEAVITT REPORTING, INC.

17

1  relative to the calculation of differentials for
2  overtime after the conversion to the PeopleSoft
3  system?
4      A.  Yes.
5      Q.  Just going to paragraph five --
6      A.  Uh-huh.
7      Q.  -- it states the new system does not
8  automatically include differentials paid to
9  certain employees in calculating the overtime
10 rate.  Did I read that correctly?
11     A.  Right.
12     Q.  Having read that, prior to the
13 conversion of PeopleSoft were the differentials
14 included in the calculation of the overtime
15 rate?
16     A.  I don't recall, but it appears so.  I
17 would say from reading this that they probably
18 were.
19     Q.  Do you recall at some point being
20 notified by representatives of the Union that
21 the differentials were not being included in the
22 overtime being paid Sheriff's Department
23 employees?

LEAVITT REPORTING, INC.

18

1      A.  I don't recall that.
2      Q.  Do you know somebody named Cindy
3  McManus?
4      A.  Yes.
5      Q.  Who is she?
6      A.  She at that time was a representative
7  from AFSCME.
8      Q.  Was she responsible for representing
9  Local 419 employees?
10     A.  I'm not positive but she could have
11 been.
12     Q.  Did you meet with Cindy McManus and
13 local union officials about the PeopleSoft
14 conversion?
15     A.  We discussed the issue.  Whether it
16 was a meeting specifically for that purpose or
17 in conjunction with other discussions whether
18 they be collective bargaining in general or
19 labor issues in general I couldn't be sure.
20     Q.  Do you recall being concerned about
21 the fact that or do you recall being concerned
22 that the differentials were not being calculated
23 in the overtime payments for Sheriff's

LEAVITT REPORTING, INC.

19

1  Department employees?
2      A.  There were a lot of -- there were a
3  number of issues in the conversion that the
4  Sheriff's Department was concerned about.  That
5  may have been one of them.
6      Q.  Do you know an individual named Sally
7  Glora?
8      A.  Yes.
9      Q.  Who is she?
10     A.  She was the City Auditor at the time.
11     Q.  At some point after the conversion to
12 PeopleSoft did you send Sally Glora a memorandum
13 about your concerns about the conversion and how
14 it impacted employees of the Sheriff's
15 Department?
16     A.  I may have.
17     Q.  I'm going to show you another exhibit.
18         (Exhibit No. 2 marked for
19 identification).
20     Q.  I will give you a few minutes.  It's a
21 pretty long memo so take your time.
22     A.  Okay.
23     Q.  Have you had a chance to read Exhibit

LEAVITT REPORTING, INC.

20

1  Two?
2      A.  Yes.
3      Q.  Is Exhibit Two a memo that you wrote
4  to Sally Glora?
5      A.  Yes, it is.
6      Q.  And the subject of it is the
7  PeopleSoft conversion --
8      A.  Yes.
9      Q.  -- and the impact that had on the
10 payroll for Suffolk County Sheriff's Department
11 employees?
12     A.  Yes.
13     Q.  I'm going to cut to the chase here and
14 ask you to turn to the second page of the memo
15 to the second to last bullet point.
16     A.  Okay.
17     Q.  It says the method of FSLA overtime
18 rate calculation is not consistent with that
19 used by the SCSD before implementation.  Did I
20 read that correctly?
21     A.  Yes.
22     Q.  How is the method of FSLA overtime
23 rate calculation not consistent with what the

LEAVITT REPORTING, INC.

## 21

1  Sheriff's Department had used before PeopleSoft
2  was implemented?
3      A.  I don't exactly recall.
4      Q.  Well, at the time you wrote this
5  though you were concerned enough to put it into
6  a bullet point obviously in the memo you wrote
7  to Glora?
8      A.  Yes.  It definitely was a problem.
9      Q.  What is the FSLA?
10     A.  Fair Standards in Labor Act I believe.
11     Q.  Is it actually the FLSA, Fair Labor
12 Standards Act?
13     A.  It could be.
14     Q.  While you were the Chief Financial
15 Officer did you have responsibilities for making
16 sure that the Sheriff's Department complied with
17 the Fair Labor Standards Act?
18     A.  In conjunction with our General
19 Counsel's Office.  If there was a question of
20 what was legal or not I would consult the
21 General Counsel's Office.
22     Q.  But you had no doubt at the time that
23 you were working at the Sheriff's Department

LEAVITT REPORTING, INC.

## 22

1  that the Fair Labor Standards Act applied to the
2  Sheriff's Department, right?
3      A.  I was under that impression.
4      Q.  Was it your impression that that
5  applied to the members of Local 419?
6      A.  Yes.
7      Q.  And also to the members of Local 3643?
8      A.  Yes.
9      Q.  And to the other locals represented by
10 AFSCME at the time?
11     A.  Yes.
12     Q.  Now, part of what the Fair Labor
13 Standards Act addresses is the payment of
14 overtime, correct?
15     A.  I believe so.
16     Q.  Was that your understanding when you
17 were the Chief Financial Officer?
18     A.  Yes.
19     Q.  With respect to the differentials that
20 you testified to earlier, were those included in
21 the calculation of overtime paid to unionized
22 members of the Sheriff's Department, unionized
23 employees of the Sheriff's Department prior to

LEAVITT REPORTING, INC.

## 23

1  the conversion to PeopleSoft?
2      A.  I don't recall.
3      Q.  After the conversion were they not
4  included in the overtime calculations?
5      A.  I don't recall.
6      Q.  Turning back to Exhibit One, looking
7  at paragraph five, I will just read your
8  statement there again.  The new system does not
9  automatically include differentials paid to
10 certain employees in calculating the overtime
11 rate.
12     A.  Uh-huh.
13     Q.  Does that refresh your memory as to
14 how overtime was calculated with respect to the
15 differentials before and after the PeopleSoft
16 conversion?
17     A.  My hesitancy in answering yes is that
18 one of the things that we did after the
19 PeopleSoft conversion was to -- there was
20 separate payments which I think are spoken about
21 a little bit in the memo that were made because
22 the system didn't do certain things.  Then data
23 would be entered in.

LEAVITT REPORTING, INC.

## 24

1          And like it said there's an
2  example of someone receiving a check for $7.52.
3  Officers used to get multiple checks each week.
4  So some of those other checks may have been the
5  differentials and may have been as a result of
6  what PeopleSoft could and couldn't do.  So
7  that's why I can't say definitively yes, they
8  were included or they weren't.
9      Q.  After you wrote your memo to Miss
10 Glora did you have conversations with her about
11 the issues that you identified in the bullet
12 points?
13     A.  I may have.  I don't recall.
14     Q.  Do you recall having any conversation
15 with her about Fair Labor Standards Act
16 compliance?
17     A.  I don't recall.  I certainly may have.
18     Q.  Earlier you identified an individual
19 named Michael Cawley?
20     A.  Yes.
21     Q.  Was he the Director of Personnel in
22 October of 2000?
23     A.  I don't know for sure.

LEAVITT REPORTING, INC.

25

1  (Exhibit No. 3 marked for
2  identification).
3      Q.  We have placed before you what's been
4  marked as Exhibit Three --
5      A.  Uh-huh.
6      Q.  -- which is a memo to Charles Abate
7  from Michael Cawley with a cc to Thomas Yotts.
8  I'll just give you a few minutes to look that
9  over.
10     A.  Okay.
11     Q.  Have you had a chance to read that,
12 Mr. Yotts?
13     A.  Yes.
14     Q.  First of all, this memo was addressed
15 to a person named Charles Abate?
16     A.  Abate.
17     Q.  Sorry.  Was he the Director of
18 Employee Relations on October 5, 2000 at the
19 Sheriff's Department?
20     A.  I don't think so.  I'm not sure there
21 was a director.  He was an attorney who handled
22 employee relations.
23     Q.  And the author of the memo here is

LEAVITT REPORTING, INC.

26

1  Michael J. Cawley, Director of Personnel?
2      A.  Yes.
3      Q.  And you're copied on it as the Chief
4  Financial Officer?
5      A.  Correct.
6      Q.  Did you receive this?
7      A.  I believe I did.
8      Q.  Ian Gaisford, did he report to you?
9      A.  Yes, he did.
10     Q.  And this memo relates to the issue of
11 overtime calculations paid to Sheriff's
12 Department employees?
13     A.  Correct.
14     Q.  One of the issues is how overtime had
15 been calculated prior to October 5, 2000, right?
16     A.  Correct.
17     Q.  And there's an underlined section in
18 bold, FLSA calculation prior to PeopleSoft?
19     A.  Correct.
20     Q.  Now, in the first paragraph that
21 describes how employees of the Sheriff's
22 Department came to be paid their regular pay and
23 overtime pay prior to the time PeopleSoft was

LEAVITT REPORTING, INC.

27

1  implemented, right?
2      A.  Right.
3      Q.  And it recounts what you testified to
4  earlier, correct?
5      A.  Right.
6      Q.  That data was taken over to the City
7  and the City would -- I'm going to quote here --
8  would include the number of OT hours worked
9  multiplied by the FLSA rate?
10     A.  Uh-huh.
11     Q.  Is that your understanding of how
12 payments were made?
13     A.  Yes.
14     Q.  The last sentence of this paragraph
15 says the FLSA rate included payments received
16 for regular hours worked and differentials.  Did
17 I read that accurately?  Do you see that?  I can
18 show you.
19     A.  Yes.
20     Q.  Does that refresh your memory as to
21 how Sheriff's Department employees were paid,
22 how their overtime was calculated prior to the
23 conversion over to PeopleSoft, that the

LEAVITT REPORTING, INC.

28

1  differentials were included in the FLSA rate?
2      A.  Yes.
3      Q.  Now that changed after the City of
4  Boston converted to PeopleSoft, right?
5      A.  It appears so.
6      Q.  It changed in that the differentials
7  were no longer included in the FLSA rate?
8      A.  Correct.
9      Q.  At the time you received this memo did
10 you understand that or was it your belief that
11 the manner in which employees were being paid
12 without their differentials being included in
13 their FLSA rate was a violation of the FLSA?
14     A.  Repeat the question please.
15     Q.  Was it your understanding at the time
16 that you received this memo that because the
17 employees were not having their differentials
18 included in their FLSA rate that that was a
19 violation of the FLSA?
20     A.  No.
21     Q.  Did you believe that it complied with
22 the FLSA not to have the differentials included?
23     A.  I believe that we were -- that the

LEAVITT REPORTING, INC.

29

1    Sheriff's Department was told by the City of
2    Boston that it was in compliance with the FLSA
3    which I think this memo also states.
4        Q.   Where does it state that?
5        A.   I can't find it in here.
6        Q.   In fact, it's fair to say that the
7    author of this memo, Mr. Cawley, advises that
8    the Department not follow FLSA guidelines in
9    paying the employees?
10       A.   No, I don't think that's fair to say.
11       Q.   Turning to the last page of the memo
12   could you look at the item marked or identified
13   as Option 2?
14       A.   Uh-huh.
15       Q.   And read that to yourself?
16       A.   Uh-huh.
17       Q.   It states follow the strict guidelines
18   of the FLSA in calculating OT rates. Under this
19   scenario the OT rate would include the regular
20   wages and all differentials. The wellness money
21   would also have to be included in this rate.
22   That is something that Mr. Cawley wrote?
23       A.   Yes.

LEAVITT REPORTING, INC.

30

1        Q.   But in the memo he does not recommend
2    that the Department follow Option 2, isn't that
3    right?
4        A.   I believe that's correct.
5        Q.   At the time you received this memo did
6    you understand that the way in which employees
7    were being paid overtime did not comply with the
8    FLSA following the conversion to PeopleSoft?
9        A.   No. I believe it did not follow the
10   strict guidelines of the FLSA.
11       Q.   So you're making a distinction between
12   strict guidelines of the FLSA and some other
13   version of the FLSA?
14       A.   Yes.
15       Q.   Do you believe that there are strict
16   guidelines of the FLSA and optional guidelines
17   of the FLSA?
18       A.   No. I think it says in the second to
19   last paragraph it talks about implementing every
20   aspect of the FLSA.
21       Q.   Do you believe as you sit here today
22   that it was optional for the Suffolk County
23   Sheriff's Department to implement the FLSA?

LEAVITT REPORTING, INC.

31

1        A.   I don't know.
2        Q.   Did you meet with the Union about the
3    issues that were discussed in Mr. Cawley's
4    memorandum?
5        A.   I believe we met with the Union --
6    that I met with other people from the Sheriff's
7    Department with the Union to discuss the issues
8    that came about as a result of the conversion to
9    PeopleSoft, some of which are mentioned in this
10   memo.
11       Q.   Did you and the Union have discussions
12   about how overtime was being calculated without
13   the differentials being included after the
14   conversion to PeopleSoft?
15       A.   We may have. I don't recall
16   specifically.
17       Q.   Do you recall Cindy McManus requesting
18   on behalf of the Union that the Sheriff's
19   Department go back to calculating overtime in
20   the manner it did before the conversion to
21   PeopleSoft to include the differentials?
22       A.   I don't recall but she may have.
23       Q.   Do you recall her telling you that

LEAVITT REPORTING, INC.

32

1    employees were being paid less as a result of
2    the method of calculating overtime not including
3    the differentials?
4        A.   I don't recall.
5        Q.   Did you ever tell her that the
6    Sheriff's Department would make all employees
7    whole for anything that they were being
8    underpaid as a result of the PeopleSoft
9    conversion?
10       A.   I don't recall.
11       Q.   Wasn't one of the issues with the
12   PeopleSoft conversion that the public safety
13   differential wasn't being paid to employees?
14       A.   I don't recall.
15       Q.   Do you recall what if any of the
16   options Mr. Cawley advised you and Mr. Gaisford
17   and Mr. Abate about with respect to let's call
18   it the calculation dispute that the Sheriff's
19   Department adopted?
20       A.   I believe we continued the City's
21   methodology.
22       Q.   And you did that knowing that the
23   Sheriff's Department was not in compliance with

LEAVITT REPORTING, INC.

33

1  the FLSA in adopting the City's methodology?

2     A.  No, I don't believe that's the case.

3     Q.  Was the Department complying with the

4  FLSA?

5     A.  I believe the City told us that the

6  method that they were using was in compliance

7  with FLSA.

8     Q.  Who was it from the City who told you

9  that?

10    A.  I don't recall.

11    Q.  Just a couple more things.  There's a

12  reference in here to a B A I S E project?

13    A.  Uh-huh.

14    Q.  What does BAISE stand for?

15    A.  I don't recall.

16       MR. RICE:  Off the record.

17       (Discussion off the record).

18    Q.  Just a couple more questions.  Turning

19  to Exhibit One, your Affidavit --

20    A.  Uh-huh.

21    Q.  -- you state in paragraph eight, I am

22  in the process of compiling data that compares

23  the new system and the old system and the Fair

LEAVITT REPORTING, INC.

34

1  Labor Standards Act.  Then in paragraph nine,

2  once the comparison is complete the Department

3  and the Union will be better informed at

4  bargaining the impact of the change.

5       Did you ever provide the Union

6  with data that made the comparison between the

7  new system, the old system and the Fair Labor

8  Standards Act?

9     A.  I don't recall.

10    Q.  Did you provide the Union with Exhibit

11  Three?

12    A.  I don't recall.

13    Q.  At any point in time you were the

14  Chief Financial Officer were you involved in

15  discussions with any other officials of the

16  Sheriff's Department about trying to make

17  adjustments so that the differentials would once

18  again be included in the overtime payments?

19    A.  I may have, but I don't recall

20  specifically.

21    Q.  Did you ever advise any official of

22  the Department that the Department shouldn't

23  include the differentials in the calculation of

LEAVITT REPORTING, INC.

35

1  overtime?

2     A.  I don't recall.

3     Q.  Who did you report to as the Chief

4  Financial Officer besides the Sheriff?

5     A.  Either the Special Sheriff or the

6  Chief of Staff.  I don't recall whether both of

7  those offices were filled or only one at the

8  time.

9     Q.  Would you just identify the

10  individuals who were the Chief of Staff while

11  you were the Chief Financial Officer?

12    A.  Again going backwards chronologically,

13  Elizabeth Keeley, Brian Burns.  That's probably

14  it for Chief of Staff.

15       MR. RICE:  I have no further

16  questions.  Thank you for coming in.

17  **Examination by Mr. Homsy:**

18    Q.  **Just** a couple questions.

19    A.  Sure.

20    Q.  You said when you testified earlier

21  that when you transferred over to the PeopleSoft

22  there were a number of problems, one of them

23  which was payment of overtime that came to your

LEAVITT REPORTING, INC.

36

1  attention.  What were some of the other problems

2  that you recall?

3     A.  I think Exhibit Two is a good list.

4     Q.  Do you remember if that was a complete

5  list or maybe there were some others, you just

6  put highlights on there?  Do you have any

7  recollection?

8     A.  I don't recall.

9     Q.  I believe you've also testified that

10  at no time did you ever believe that the

11  Sheriff's Department was in violation of the

12  Fair Labor Standards Act, is that accurate?

13    A.  Correct.

14    Q.  Why did you have that belief?

15    A.  I think we were reassured by the City

16  of Boston to that effect.

17    Q.  Who from the City of Boston assured

18  you that the Sheriff's Department was never in

19  violation of FLSA?

20    A.  I don't recall.

21    Q.  Who could it have been?

22       MR. RICE:  Objection.  He can't

23  speculate.

LEAVITT REPORTING, INC.

1  Q.  Were you ever made aware personally or
2  made aware from a third party?
3      A.  I don't recall.
4      Q.  Who did you communicate with from the
5  City of Boston on a regular basis?
6      A.  The Auditing Department, Treasury
7  Department, Personnel Department or Human
8  Resources, whatever it was called, and Budget
9  Department.
10     Q.  Okay.  Do you recall the people in
11 charge of those departments in the City of
12 Boston during the time on or around October of
13 2000?
14     A.  I believe the Auditing Department was
15 run by Sally Glora.  She may have also at that
16 time been in charge of the Treasury.  I don't
17 recall who was in charge of Personnel.  One of
18 the people that I would contact on a regular
19 basis would be Tom Francis in Personnel.  And
20 Budget, I can't recall again who was in charge,
21 but we had a Budget Analyst that I would
22 converse with on a regular basis.  His name is
23 escaping me right now also.  Sorry, Tony
                LEAVITT REPORTING, INC.

1  Reppucci I believe was our Analyst.
2      Q.  How do you spell that?
3      A.  R E P P U C C I, I think.
4      Q.  Do you recall having conversations
5  with either Tom Francis, Sally Glora or Tony
6  Reppucci regarding the payment of overtime wages
7  following the conversion to PeopleSoft?
8      A.  I don't specifically.
9      Q.  Do you recall whether anybody that
10 worked under you had conversations that they
11 informed you of later with either Tom Francis,
12 Sally Glora or Tony Reppucci after the
13 conversion to PeopleSoft regarding overtime
14 wages?
15     A.  I don't.
16     Q.  Do you know what the status was of the
17 payment of overtime wages at the time you left
18 the Sheriff's Department?
19     A.  I don't know.
20     Q.  Is it fair to say that following the
21 conversion to PeopleSoft that you followed the
22 City of Boston's recommendation on how to
23 calculate overtime wages?
                LEAVITT REPORTING, INC.

1  MR. RICE:  Objection.  You can
2  answer.
3      A.  Would you repeat the question?
4      Q.  Sure.  Following the conversion to
5  PeopleSoft did the Sheriff's Department follow
6  the recommendation of the City of Boston on how
7  to calculate overtime wages?
8      A.  I don't know if I'd call it a
9  recommendation.  It was a methodology that to a
10 certain degree we were captive of their system
11 and that's how their system calculated it.
12     Q.  Okay.  Was there anything that the
13 Sheriff's Department could have done to use a
14 different methodology?
15     A.  No.  We didn't have the physical means
16 to do it differently.
17     Q.  Did the Sheriff's Department have any
18 physical means to verify the numbers under the
19 new methodology to see if it was calculated the
20 same as it was under the prior methodology
21 before the conversion to PeopleSoft?
22     A.  I think we had access to data that
23 would allow us to do those calculations if we
                LEAVITT REPORTING, INC.

1  chose to.
2      Q.  Did you do those calculations?
3      A.  I don't know.
4      Q.  Could the Sheriff's Department have
5  made changes to the PeopleSoft system if it had
6  so sought?
7      A.  No.  We didn't control the system.
8      Q.  Who were the people at the City of
9  Boston that could control the system?
10     A.  Sally Glora was the person in charge.
11     Q.  Okay.  So if there was to be a change
12 made in the PeopleSoft system it would have had
13 to have been approved by Sally Glora?
14     A.  Or if she delegated the ability to
15 somebody who reported to her.
16     Q.  Did you ever make any requests to have
17 the system changed?
18     A.  I think this Exhibit Two is somewhat
19 of a request.
20     Q.  What was Sally Glora's response to
21 Exhibit Two?
22     A.  I don't recall.
23     Q.  Do you recall whether there was a
                LEAVITT REPORTING, INC.

41

1  response to Exhibit Two?
2     A.  I don't.
3     Q.  Did you have the understanding that
4  the union members were getting a better deal
5  with using the City of Boston's methodology than
6  they were using the prior methodology prior to
7  the conversion to PeopleSoft?
8        MR. RICE:  Objection.  You can
9  answer.
10    A.  No.  I wouldn't say one hundred
11 percent of the union members were getting a
12 better deal under the system subsequent to the
13 implementation of PeopleSoft, but certainly
14 there were some.  And the question was, I guess,
15 were more better off or were less better off.
16    Q.  Did you discuss this with union
17 officials?
18    A.  I believe we did.
19    Q.  Who did you discuss it with in
20 particular?
21    A.  I don't recall.
22    Q.  Did you yourself have these
23 discussions with the union members?
         LEAVITT REPORTING, INC.

42

1     A.  I believe so.
2     Q.  Do you recall around the time you had
3  these discussions?
4     A.  No.
5     Q.  Do you recall whether it was after
6  Exhibit Three was produced?
7     A.  I don't recall.
8     Q.  Okay.  What was the resolution of
9  those meetings?
10       MR. RICE:  Objection.
11    A.  I don't recall.
12       MR. HOMSY:  I have no other
13 questions.
14       MR. RICE:  Thank you.
15       (The deposition was concluded at
16 11:06 a.m.)
17
18
19
20
21
22
23
         LEAVITT REPORTING, INC.

43

1         C E R T I F I C A T E
2
3
4  STATE OF MASSACHUSETTS
5  COUNTY OF PLYMOUTH
6
7       I, Carolyn McGill, a Notary Public in
8  and for the State of Massachusetts, do hereby
9  certify that the foregoing transcript of the
10 deposition of Thomas Yotts, having been duly
11 sworn by the Notary Public, on Wednesday, June
12 6, 2007, is true and accurate to the best of my
13 knowledge, skill and ability.
14      IN WITNESS WHEREOF, I have hereunto set
15 my hand and seal this 6th day of June, 2007.
16
17        _____
18          Carolyn McGill
19
20 My commission expires:
21 April 21, 2011
22
23
         LEAVITT REPORTING, INC.

# EXHIBIT 5

November 24, 1998

Dear Union President/Representatives:

As you know, the City is currently implementing PeopleSoft, a state of the art software program, which will update and improve the City's current financial, human resource and payroll systems. The City's implementation of PeopleSoft will allow it to provide the following additional benefits to its employees:

- The City will be able to provide detailed summaries of earnings, deductions and leave accruals with each payment made to its employees;

- The City's new system will allow it to expand flexible spending accounts to include a medical as well as a dependent care option;

- The City will be able to pay step rate increases on an employee's true anniversary date;

- The City will be able to deduct and distribute union dues and/ or agency service fees every pay period.

In order to maximize the functionality and efficiency of PeopleSoft, the City is also considering the following changes to its current payroll system:

- Converting to a Saturday through Friday pay week instead of a Wednesday through Tuesday pay week. The existing workweek as defined in your current collective bargaining agreement(s) will not change;

- Consolidating all employee earnings (i.e., base pay and overtime) during each pay period into a single payment;

- Standardizing all deductions (i.e., health insurance, life insurance, union dues). Under this system, the City would make deductions in equal amounts, from each payment made to its employees;

- Standardizing longevity payments. Under this system, the City would include prorated longevity payments in each payment made to appropriate employees;

- Providing its employees with the option of direct deposit or having their checks mailed to their homes. Employees will receive mailed checks on appropriate Fridays. Accordingly, the City will not distribute paychecks to its employees at work.

The City hopes to implement the above-noted changes as soon as possible but no later than January 1, 2000. If you would like to discuss any of these changes and/ or new benefits, please contact my office as soon as possible, but in no event later than March 26, 1999.

Thank you for your anticipated cooperation.

Very truly yours,


Virginia Tisei, Director
Office of Labor Relations


cc.   Dennis DiMarzio, COO, City of Boston
      Edward Collins, CFO, City of Boston
      Sally Glora, Director, BAISP
      Joe Sarno, Esq.

# EXHIBIT 6

TO:            Charles Abate – Employee Relations

FROM:          Michael J. Cawley – Director of Personnel

CC:            Thomas Yotts  - Chief Financial Officer
               Ian Gaisford – Deputy Financial Officer

DATE:          October 5, 2000

RE:            Overtime Calculation

The intent of this memo is to provide you with information regarding overtime calculation so the Department can formalize, with both City Hall and the Unions, our policy on calculating overtime rates. Please find below descriptions of how OT has been calculated in the past, how we currently calculate OT and recommendations on how we should calculate OT.

### FLSA Calculation Prior to PeopleSoft

Prior to the conversion to PeopleSoft in October of 1999, our payroll data including OT calculation was processed on Datacase. The Personnel Division would send a weekly OT disk up to City Hall, which would include the number of OT hours worked multiplied by the FLSA rate. The FLSA rate included payments received for regular hours worked and differentials.

| Example 1: | John Smith | 40 hrs per week @ $20.00 for a weekly salary of | $800.00 |
|---|---|---|---|
| | | 40 hrs of Night Diff @ $1.00 pr hour | $40.00 |
| | | 16 hrs of Weekend Diff  @ $1.00 pr hr | $16.00 |
| | | | $856.00 |

**FLSA Rate = $856.00/40hrs = $21.40  x 1.5 = $32.10**

| Example 2: | John Smith | Called in sick on one day | |
|---|---|---|---|
| | | 40 hrs per week @ $20.00 for a weekly salary of | $800.00 |
| | | 32 hrs of Night Diff @ $1.00 pr hour | $32.00 |
| | | 16 hrs of Weekend Diff  @ $1.00 pr hr | $16.00 |
| | | | $848.00 |

**FLSA Rate = $848.00/40hrs = 21.20 x 1.5 = $31.80**

### Notes:

It should be noted that the intent of the Datacase calculations was to include the amount employees earned in differentials into the OT rate paid.

It also should be noted that the rate calculated was based on the previous workweek and not the week in which the overtime was worked.  Strict interpretation of the FLSA dictates that these calculations be generated for the week in which the employee works OT.

It should also be noted that when employees had not worked forty hours, they were still paid at a rate of least 1.5x the regular rate.  The FLSA states that until an employee actually works forty hours, he/she should be paid at straight time. (see Example 2 on page 2)

## FLSA Calculation by PeopleSoft, 10/99 to present:

The BAISE project has configured the PeopleSoft System to calculate overtime at 1.5 x the regular hourly rate.

| Example 1: | John Smith | 40 hrs per week @ $20.00 for a weekly salary of | $800.00 |
| | | 40 hrs of Night Diff @ $1.00 pr hour | $40.00 |
| | | 16 hrs of Weekend Diff @ $1.00 pr hr | $16.00 |
| | | | $856.00 |

### FLSA Rate = $800.00/40hrs = 20.00 x 1.5 = $30.00

Ms. Sally Glora, City of Boston Auditor and Project Manager of the BAISE Project indicated that the reason the BAISE project does not utilize FLSA calculations is that employees who are paid 1.5x the regular hourly rate are receiving a better rate than if FLSA guidelines are followed. The specific guideline that Ms. Glora is referring to states that until an employee actually works 40 hours, only then, are they entitled to hours paid on an overtime rate. (see below example)

| Example2: | John Smith | 32 Reg hrs per week @ $20.00 for a weekly salary of | $640.00 |
| | | 8 Sick hrs (or Vac, Comp & Credit) | $160.00 |

If Mr. Smith works 8 hr OT in this week, he would earn those 8 hrs at the regular rate of $20.00 pr hour because he did not work 40 hours in that week.

In my opinion, the City of Boston came to the conclusion that employees were most likely being over paid by using the flat 1.5 rate. The City is willing to overlook that added expense in exchange for not adhering to the extensive guidelines required to fully implement the FLSA. Fully implementing the FLSA guidelines would be an administrative and logistical nightmare for the BAISE project.

### Recommendations

Based on meetings with the BAISE project leaders and as a result of inquiries from AFSCME, I feel as though we have two viable options. These options are based on the assumption that we are either going to follow the FLSA and all it's guidelines or that we are going to follow the CBA's in reference to "hours of work and overtime" language. In my opinion we have to educate the unions as to the options available.

**Option 1** –Continue to calculate the overtime rate at 1.5x the regular rate. This would benefit both the employees as well as the Department.

### Employee Benefit's

- The employees would benefit by not having to actually work forty hours in a week in order to earn more than their regular rate of pay for OT hours. For example, an employee could use a "comp taken" day, work overtime and be compensated at the 1.5 rate. Under the FLSA scenario, an employee would take a comp day, work overtime and be compensated at straight time for the OT worked. This would be our strongest argument to the unions for keeping the rate as it is currently calculated.

- The employees would benefit in that they would receive a consistent OT rate as opposed to a different rate each week. This would eliminate confusion.

### Department Benefits

- The Personnel Division would not have to expend the time and resources of working with the BAISE Project on such a grand undertaking.
- The Department would not be at risk of having to change the OT calculation if and when we are assumed by the state.
- The Department would finally bring closure to the conflicting language between the FLSA and the CBA's.
- The Department would not have to calculate any retroactive OT payments from October 1999. An undesirable result of any retro calculations will most likely bring to light that employees have been overpaid under the FLSA guidelines.

**Option 2** –Follow the strict guidelines of the FLSA in calculating OT rates. Under this scenario, the OT rate would include the regular wages, and all differentials. The wellness money would also have to be included in this rate.

### Employee Benefits
- Some employees would see an increase in their OT rate as a result of including the various differentials. This would only affect individuals who do not take time off.

### Department Benefits

- The Department would finally be in full compliance with the FLSA.
- This could lead to a small decrease in the amount of sick time taken. For example if an officer knows that if he calls in sick and works overtime in the same pay period, he/she will only be paid straight time for the OT hour worked.

    In conclusion, I feel that the Department's stance should be similar to that of the City of Boston as it relates to the overtime calculation. We either follow the language of the CBA's and not include differentials in OT calculation, or we implement every aspect of the FLSA including the provision that employees must work forty hours before the FLSA rate takes effect. I think we have to convey to the unions that at best, with strict adherence to the FLSA, some of their members may receive additional compensation but many of their members will only receive straight time for overtime worked in a week in which they utilize accrued time. I am also confident that if retroactive payments are required to be processed under the FLSA rules, many employees would owe the Department money.

    I realize this is a lot to digest so please call me with any questions or concerns so we may bring this issue to a conclusion.

# EXHIBIT 7

Volume:       I
Pages:        1 to 88
Exhibits:     per index

COMMONWEALTH OF MASSACHUSETTS
BEFORE THE LABOR RELATIONS COMMISSION

* - - - - - - - - - - - - - -        Case No:
In the Matter of                      MUP-01-2911

SUFFOLK COUNTY SHERIFF'S
DEPARTMENT

vs.

AFSCME, COUNCIL 93
* - - - - - - - - - - - - - - -

Commissioners Participating:

    Helen A. Moreschi, Chairwoman
    Peter G. Torkildsen, Commissioner
    Mark A. Preble, Commissioner (Dissenting)

Hearing Officer:  Cynthia Spahl

Appearances:

Kathleen Cawley, Esquire    Representing Suffolk
                            County Sheriff's
                            Department

Angela Wessels, Esquire     Representing AFSCME,
                            Council 93

- - - - - - - - - - - - - -

BRAMANTI & LYONS COURT REPORTING, INC.
Registered Professional Reporters
240 Commercial St., Boston, MA 02109
Tel:  617.723.7321 / Fax:  617.523.5153
www.bramanti-lyons.com

1      that point.

2                    HEARING OFFICER: Thank you.  Would you

3      like to call your first witness?

4                    MS. CAWLEY: Yes.  I'd call Maura

5      McDonough, please.

6                    HEARING OFFICER: Do you swear or affirm

7      that the testimony that you are about to give is the

8      truth, the whole truth and nothing but the truth?

9                    THE WITNESS: Yes.

10                   HEARING OFFICER: You may be seated.

11                        **DIRECT EXAMINATION**

12     **BY MS. CAWLEY:**

13  Q.  Can you state your name and position, please?

14  A.  My name is Maura McDonough, and I am the Director of

15     Personnel at the Suffolk County Sheriff's

16     Department.

17  Q.  And prior to being named Director of Personnel, what

18     was your position?

19  A.  Assistant Director of Personnel.

20  Q.  And what was your main area of responsibility?

21  A.  Payroll.

22  Q.  Are you familiar with the issue of the PeopleSoft's

23     conversion?

24  A.  Yes.

1 Q. And can you just give us a little background on how

2   that all came about and what evolved on that?

3 A. As Sally said, back in '97 they made the decision to

4   computerize the payroll.  I had a couple of meetings

5   up at City Hall, group meetings with a person

6   selected from each department, and we discussed a

7   time frame back in '97 and then '98.

8      By the time the summer of '99 came around,

9   that's when we -- I was pretty much up at City Hall

10   three days a week at the base project with other

11   members of City Hall, and we were discussing what we

12   needed the system to do.  They were showing us on a

13   live version of the system, you know, a computer

14   right in there, hands-on, what the system could do,

15   the changes that were going to be made and the like.

16   And we actually did go live.  It was actually

17   October 30th the first day we were paid on

18   PeopleSoft.  That's week ending November 5th, 1999

19   was the first paycheck that was cut on PeopleSoft.

20 Q. And were there problems with those paychecks?

21 A. Yes, yes, there was.

22 Q. Can you just describe some of the different issues

23   that came up in the beginning?

24 A. At the very beginning, I believe it took about seven

1    weeks for anyone to receive any public safety

2    differential at all.  There was a problem with that

3    upload.  What happens is all the rates of pay are

4    done in OHR at City Hall.  I give them the rate, the

5    contract pretty much gives them the rate, and then

6    they'll have, you know, employee John Smith gets X

7    dollars an hour plus this differential, this

8    differential, and it will list the differentials

9    down.

10            For whatever reason, and right now I'm not

11   entirely sure why, public safety was not in there so

12   no one got that for seven weeks, and then once it

13   did enter the system we paid them retroactively

14   seven weeks worth of public safety.  Mostly everyone

15   got a weekly paycheck every single week.  I mean,

16   there were days where some people got an extra day

17   of pay.

18            HEARING OFFICER: Just a second, please.

19   This is Tape 3 in Case Number MUP-01-2911, Suffolk

20   County Sheriff's Department and AFSCME, Council 93.

21   You may continue.

22   A.  Thanks.  Like I was saying, most of the problems

23   were related to differentials being paid correctly.

24   There were other problems, though, that related to

1    schedules.

2            Prior to the conversion, I requested that

3    1134 be classified as salaried, and that is because

4    they worked 32 hours one week and then 48 the next,

5    at least a lot of their members do.  And in order to

6    pay 40 hours each week, they had to be salaried.  If

7    they weren't, then they would literally get a check

8    for 32 hours one week, 48 hours the next.

9            Once we went live, we realized that that

10   was also a problem for all other uniformed officers

11   because they can do swap-ons, swap-off, they can

12   swap intershift, and for many other reasons they

13   needed to be salaried as well.  Originally, we just

14   thought it was 1134, but as the first couple of

15   paychecks came out, the captains would be paid 48

16   hours one week and then 32 the next.  So basically

17   what we had to do is we had to put fake schedules in

18   the system.  We had to pretend that all of our

19   captains and lieutenants and all of 419 members

20   worked 40 hours a week regardless of whether or not

21   they worked a swap or whether they had every other

22   weekend off.

23   Q.  Could you just explain a little bit how the overtime

24       calculation was done under the Data E's way?

1    A.    In the Data E's System, all differentials and

2          regular weekly hourly rates were in the system.  So

3          if an officer worked -- was on the night shift and

4          got public safety differential, then that was

5          included in their OT in the sense that if they got

6          40 hours of public safety, 40 hours of night dif.

7          and 40 hours of regular pay, all of that would be

8          added up, divided by 40 and that would be their

9          overtime rate.

10               In the same respect, if an employee took a

11         comp day or a personal day or a sick day and they

12         were not entitled to the differentials, then they

13         would get 32 hours of public safety, 32 hours of

14         night dif., 40 hours of actual pay, and then that

15         would be divided by 40, so the overtime rate would

16         have been slightly lower than if they actually

17         worked every single day that week.  So every week

18         every employee's overtime rate was different.

19   Q.    And how was that sent up to City Hall?

20   A.    On a disk.  We ran reports in Data E's, saved them

21         on a disk and someone would walk up, bring that disk

22         up to City Hall.

23   Q.    And how is the overtime rate calculated now under

24         the People Soft System?

```
1    A.    Now, it is their hourly rate multiplied by 1.5.

2    Q.    Have there been other changes in the system from

3          Data E's to PeopleSoft as a result of those --

4    A.    Yes.   Under Data E's if someone was paid a comp day

5          or a credit day or a sick day, the system could take

6          the differentials away from that person and they

7          wouldn't earn differentials for that day, but

8          because of scheduling reasons in the way they can

9          work swaps, and I'll give you an example to make

10         this clear, but we can't enter time.   At least if we

11         did, it would cause more problems in the paychecks.

12         If we cannot -- if someone takes a comp or a credit

13         day, we cannot put an earn code in the system that

14         says that John Smith took a credit day.   So since we

15         can't enter that into the system, he, John Smith, is

16         actually getting differentials for taking credit

17         time when he shouldn't.

18   Q.    And is that -- when did that stop?

19   A.    When PeopleSoft -- when we went live with

20         PeopleSoft.   And the reason is at the House of

21         Correction an employee can swap intershift, meaning

22         that if he's on the 7 to 3 shift everyday and he

23         swaps on the 3 to 11 shift, so in effect he's

24         working 48 hours that week, we don't pay him for 48
```

BRAMANTI & LYONS

1       hours, we only pay him for 40 because when he swaps

2       off a week or two later, we're not going to pay him

3       32, we're just going to pay him the 40, and they

4       cancel each other out.

5               If the employee called in sick on that

6       swap-on, the system wouldn't know not to pay him.

7       The system can't say all right, I'm going to pay you

8       8 hours of sick time, but I'm not going to pay you

9       for 6.  It wouldn't know how to recognize that.  So

10      that employee would in effect get paid for 48 hours

11      that week because he worked 40 reg and then he

12      called in sick on his swap.  Does that make sense?

13  Q.  Yes.

14  A.  Okay.  That is the reason we need them to be

15      salaried.  I mean, if they were salaried, I could

16      put that they called in sick for 72 hours a week and

17      it would still only pay them 40.

18  Q.  Sally testified that under the Data E's way,

19      differentials were included in the overtime.  Can

20      you explain why they are not -- your understanding

21      of why they're not in the PeopleSoft System at this

22      point?

23  A.  We could pay -- we could pay, using John Smith

24      again, if he worked 8 hours of overtime and he had

```
 1        public safety dif. and night dif., the system has

 2        the ability to pay him dollar for dollar, hour for

 3        hour for that overtime shift.  I could just tack on

 4        an extra dollar an hour onto his hourly rate or an

 5        extra $2.00 onto his hourly rate, but that still

 6        wouldn't be in compliance with the Data E's way.

 7   Q.   And why do you say that?

 8   A.   Because under Data E's, we didn't pay differentials.

 9        We didn't just add -- if the differential was a

10        dollar an hour, we didn't just add a dollar to their

11        hourly rate.  We added whatever they actually worked

12        the week before, divided it by 40, and that was

13        their hourly rate.

14   Q.   So is it your testimony that the way the People Soft

15        System is set up, it would be impossible to

16        duplicate the Data E's way?

17   A.   Yes.

18                  MS. WESSELS: I'm going to object to the

19        question as leading.

20                  HEARING OFFICER: Basis?

21                  MS. WESSELS: I was going to raise an

22        objection to the question as leading, but it has

23        been answered.

24                  HEARING OFFICER: So is that objection now
```

1    withdrawn?

2              MS. WESSELS: Yes.

3              HEARING OFFICER: Okay.

4    Q.  How many times did you try to resolve this issue

5        with City Hall?

6    A.  I believe you have copies of at least four or five

7        e-mails that I sent.  There had to have been

8        twenty-five e-mails that were sent between me and

9        members of the base team that worked for Sally

10       Glora, and then the memo from Tom Yotts to Sally

11       Glora was a result of those e-mails not being

12       answered to my satisfaction.

13   Q.  And this was right at the beginning of the chain?

14       Was this at the beginning of the chain?

15   A.  The very first paycheck, I believe it was actually

16       Paul Fahey, very first week walked in and said this

17       is not -- this isn't how this should work.

18   Q.  Are you familiar with the term actual hours worked?

19   A.  Yes, I am.

20   Q.  And what does that mean?

21   A.  It has meant different things over the years, but

22       under the current contracts actual hours worked is

23       any regular day that the employee works and any

24       vacation day that the employee works, and what that

1   means is they'll get differentials for any vacation

2   day and any reg day that they work.

3 Q.   And why were vacations included and other time off

4   not?

5 A.   Because if an employee has worked with the

6   department for 20 years, he gets six weeks vacation.

7   There's no reason why he should be penalized for

8   getting more vacation.  So if we didn't include

9   vacation, then new hires who only get two weeks, at

10   the end of the year would actually get paid more

11   differentials than someone who had six weeks of

12   vacation.

13 Q.   And if a person takes a comp or credit day, are they

14   entitled to a differential for that time?

15 A.   No, they are not.

16 Q.   And under the PeopleSoft System, what has been

17   happening with that?

18 A.   They have been getting paid differentials for any

19   comp or credit or sick time taken.

20 Q.   And do you have any examples of such?

21 A.   Yes, I do.

22          MS. WESSELS: I'm going to raise an

23   objection to any further inquiry along these lines.

24   The issue before -- and these are the grounds.  The

1    issue before the Commission is a unilateral change

2    in the calculation of paying overtime to these

3    officers, and what the department I think is seeking

4    to do is kind of give an explanation for why it's

5    justified based on some other mistake that they say

6    is going on in the People Soft System, and I don't

7    think that it's this Commission's job to kind of

8    balance all of the equities of PeopleSoft to see if

9    somehow the department is coming out ahead or the

10   union is coming out ahead in all the payment of all

11   these differentials.

12           I think that this testimony is, from our

13   point of view, irrelevant to the issue in this case.

14   The witness is testifying about the payment of

15   differentials other than on overtime, under other

16   working conditions, and I -- my concern is that by

17   taking this testimony and taking this case there,

18   the department is seeking to kind of involve all of

19   us in a grand balancing scheme of equities in People

20   Soft, and I don't think -- that's not why we're

21   here.  We're not here to look at, you know, in the

22   long run is the department and the union coming out

23   ahead.  We're looking at did they make a unilateral

24   change without bargaining.  So I'm going to object

1   to anymore inquiry on the payment of differentials

2   other than on overtime.

3          HEARING OFFICER: Do you have a response,

4   Ms. Cawley?

5          MS. CAWLEY: I do.  And basically I agree

6   with Angela somewhat, but I think it's important to

7   see that the system -- there was a problem with the

8   system, and it's not just the overtime calculation

9   that changed, and obviously it's in the department's

10  interest not to overpay people so that -- I guess it

11  is kind of a balancing thing, but to show also that

12  this is a problem that we've been trying to fix

13  right along.  We obviously do not want to overpay

14  people.  We want to try to get the matter resolved.

15  So it sort of shows the department's position where

16  it's a matter that has to be fixed on both sides,

17  and had we known it was going to happen, it

18  obviously wouldn't have happened.

19         HEARING OFFICER: Do you have anything to

20  add?

21         MS. WESSELS: You know, I think that it's

22  quite literally irrelevant to the issue in this

23  case.  I don't really have anything more to add to

24  that.

BRAMANTI & LYONS

1          HEARING OFFICER: All right.  I'll sustain

2      the objection.

3   Q.  As you understand the PeopleSoft System right now,

4       is there a way to put differentials into the system?

5   A.  Yes.  There are two different ways to put

6       differentials into the system.  One is the same way

7       we put in the hourly rate which is we just send up a

8       memo to OHR at City Hall that says put in a $1.00

9       differential for every hour this person works.  The

10      other way is in time and labor, and that is on their

11      calendar, their weekly calendar, and that's how we

12      pay weekend differential.  And the reason there's a

13      difference between the two, all differentials, with

14      the exception of weekend differential and shift

15      commander differential and division manager

16      differential, get paid for 40 hours a week if the

17      person works 40 hours a week.  Weekend dif., you

18      only get it if you work on the weekend so maxed you

19      can get it for 16 hours.  Shift commander

20      differential, you only get it if you actually work

21      as the shift commander.  So that's -- there's two

22      different ways you can pay them.

23          The problem is there's no way to take

24      differentials away from a person without them being

1    salaried unless I decide that it's okay to overpay

2    people and underpay -- if I wanted to say, all

3    right, 32 hours a week one week, 48 hours the next

4    and have it go like that every single week for the

5    employees, then I could pay them -- then I could

6    take the differentials away from them.  But the way

7    the system is right now, I can't take differentials

8    away from them, and that's why the system will never

9    match the Data E's way.

10            In the Data E's way, I had the ability to

11    take differentials away from people if they took

12    time.  Under this system, if they were salaried, I

13    could do that, but since they're not salaried, I

14    cannot.

15   Q.  And have you tried to get the employees salaried?

16   A.  Yes, I have.

17   Q.  And what steps have you taken to accomplish that?

18   A.  Numerous e-mails, numerous memos, just numerous

19        requests to City Hall.

20   Q.  And what has been the response from City Hall?

21   A.  For a long time they stated, "In due time, in due

22        time.  Just do us up a memo."  Then I'd do the memo

23        and they'd say, "Oh, well, we have to counter back

24        with our own labor relations."  I have never gotten

```
 1        a definitive answer, yes, we can allow these people
 2        to be salaried or no, we cannot.
 3   Q.   Do you know who you have spoken to at City Hall
 4        regarding this issue?
 5   A.   I have spoken to Sally Glora.  She referred me to
 6        OHR, Vivian Leonard.  I spoke with Tommy Francis who
 7        works for Vivian Leonard.  He referred me to
 8        Employee Relations.  Employee Relations, I'm sort of
 9        on hold with them at the moment.
10   Q.   So is it your expectation that the employees may be
11        salaried at some point?
12   A.   It is my hope that they will be salaried.  At this
13        point I have not been told either yes or no.
14   Q.   And if employees are salaried, will the
15        differentials be calculated in with the overtime
16        rate?   When would you put differentials into the
17        system?
18   A.   Once I'm salaried -- once the employees are
19        salaried, then I can do a couple of things that are
20        all related.  I can enter people's sick vacation,
21        comp time taken.  Then that will mean that on their
22        pay stubs their time taken will be correct, where
23        right now -- there was a question earlier, they're
24        not correct.  None of the pay stubs are correct
```

```
 1            because I don't have the ability to enter time for

 2            them.  Once they're salaried, I can enter time for

 3            them.  Once I can enter time for them, their

 4            differentials will be paid correctly because it

 5            won't be paid for various other types of time.  Once

 6            that happens, then we can implement one of the three

 7            options that Sally gave me almost a year ago, and

 8            that is similar to Data E's but not exact, but it is

 9            definitely closer to the Data E's way than what

10            we're paying right now.

11    Q.      And were you aware that this issue was going to come

12            up when you had the meetings back in '97 regarding

13            --

14    A.      No.  I was assured -- well, let me be fair to City

15            Hall.  The people I met in '97 and '98 were people

16            from Anderson Consulting who know the FLSA law

17            frontwards and backwards, they know the way People

18            Soft works frontwards and backwards.  They did not

19            have, of course, experience with every union

20            contract in the city.  What they told me was: A)

21            that it would be in compliance with FLSA; and B)

22            that there would be -- it would be consistent with

23            what the contract currently says and with your

24            current policy and procedure.  The problem is that
```

1    most other city departments paid overtime.  I think

2    all of the city departments paid overtime on the

3    IPPS System that Sally mentioned, the city.  We

4    didn't.  Suffolk County Sheriff's Department paid it

5    on Data E's and then just kind of dumped the

6    information into IPPS, but it wasn't IPPS that

7    calculated it.

8  Q.  Do you know if someone from the department discussed

9    this matter with the union at some point?

10 A.  I believe -- I am not on the negotiating team or

11    committee or whatever you want to call it, but I

12    believe the union sat down with Tom Yotts, Charlie

13    Abate and Michael Harris on a couple of different

14    occasions.  I know that Cindy and Tom had plenty of

15    conversations on the phone.  At least I know that

16    from Tom.  So, secondhand.  I also know that I had

17    been told by Sally Glora that she had also talked to

18    Cindy McManus so I know that people had

19    conversations about it.

20 Q.  And just to clarify, when were you first made aware

21    that there was a problem with the overtime

22    calculation?

23 A.  The day that the check came down, I was reviewing

24    everyone's paycheck in the system.  I could look at

1    it, and I could tell many things.  One, public

2    safety wasn't paid; two, that overtime was just the

3    rate times the hourly rate times 1.5.  I could also

4    tell that if you took a sick day, it paid you one

5    penny more than if you were on a reg day.  That has

6    been corrected, but that was a -- I suppose a

7    decimal error.  And then also that day or the next

8    week a few members came into me and stated that

9    various things were wrong with their checks, whether

10   it was differentials or the OT rate, they brought

11   many things to my attention.

12              MS. CAWLEY: I have nothing further.

13              HEARING OFFICER: Okay.  Thank you.

14   Ms. Wessels?

15              MS. WESSELS: We do have some

16   cross-examination.  I need just to consult with my

17   client for a few minutes.

18              HEARING OFFICER: Sure.  Off the record.

19   (Whereupon, a recess was taken.)

20              HEARING OFFICER: Back on the record.

21   Cross, Ms. Wessels.

22                   **CROSS-EXAMINATION**

23   **BY MS. WESSELS:**

24   Q.  Good afternoon.  I just have a couple of questions.

```
 1         Now, of the four locals that are parties to this

 2         particular case, are any of those employees

 3         salaried?

 4    A.   Yes.

 5    Q.   Okay.  And which are those?

 6    A.   1134.

 7    Q.   Okay.  Are the registered nurses salaried?

 8    A.   No.

 9    Q.   They're not.  Okay.  And you would agree with me

10         that the members of Local 1134, they're not having

11         -- that since PeopleSoft has gone into effect, that

12         their overtime has not been calculated with the

13         differentials?

14    A.   Yes, that is true.

15    Q.   Is that true?

16    A.   Mm-hmm.

17    Q.   But it's possible with respect to those employees

18         who are salaried?

19    A.   Yes, yes.

20    Q.   All right.  And earlier you heard -- did you hear

21         Ms. Glora testify that an employee didn't need to be

22         a salaried employee?

23    A.   Yes, and I can explain that.

24    Q.   Well, this is my question.  My question is she --
```

BRAMANTI & LYONS

1    isn't she correct when she says employees don't need

2    to be a salaried employee to calculate a

3    differential in the overtime?

4  A.  Yes.

5  Q.  That's my only question.

6  A.  There are --

7  Q.  That's my only question.

8  A.  Okay.

9  Q.  Thank you.

10           MS. WESSELS: That's all the questions we

11   have.  Thank you.

12           HEARING OFFICER: Redirect?

13               REDIRECT EXAMINATION

14   BY MS. CAWLEY:

15  Q.  Is it -- can you talk a little bit about what Sally

16   Glora said regarding salaried employees and putting

17   in differentials?

18  A.  Yes.  In --

19           MS. WESSELS: I'm going to object.  If we

20   could just have some foundation for when Ms. Glora

21   said this, what was the context.

22           HEARING OFFICER: Do you have a response?

23           MS. CAWLEY: Yes.  Strike the last

24   question.

1   Q.   Having 1134 members salaried, does that solve the

2        overtime calculation problem as far as you know?

3   A.   It -- having 1134 configured as salaried, that means

4        they are configured correctly so that I could then

5        implement the steps needed to correctly calculate

6        overtime.  The issue is that with them salaried and

7        the other unions not salaried, the three options

8        that Sally gave me would only be able to be

9        implemented for 1134 and not the other unions.  And

10       the way we enter time on a daily basis is just all

11       the employees on such and such a date alphabetical

12       order, it doesn't say what union there is, and

13       they're just entering data.

14                  MS. CAWLEY: I have nothing further.

15                  MS. WESSELS: I may have one follow-up.

16       Let me just check.

17                  HEARING OFFICER: Off the record.

18       (Whereupon, a brief recess was taken.)

19                  HEARING OFFICER: Back on the record.  Any

20       other questions?

21                  MS. WESSELS: We don't have anything

22       further.  Thank you.

23                  HEARING OFFICER: Thank you.  You are

24       excused.

1          THE WITNESS: Thank you.

2          HEARING OFFICER: Does the respondent wish

3    to call any other witnesses at this time?

4          MS. CAWLEY: No.

5          HEARING OFFICER: Does the respondent rest

6    its case in chief?

7          MS. CAWLEY: Yes.

8          HEARING OFFICER: Does the union wish to

9    call any rebuttal witnesses?

10         MS. WESSELS: No, we don't, we rest.

11         HEARING OFFICER: All right.  At this point

12   then would the parties like to do closing statements

13   or briefs?

14         MS. WESSELS: The union would like to file

15   a written brief.

16         MS. CAWLEY: The employee would as well.

17         HEARING OFFICER: All right.  We'll go off

18   the record.

19   (Whereupon, a discussion was held off the record.)

20         HEARING OFFICER: Back on the record.

21   After conferring with counsel, we have decided that

22   briefs will be filed at the Commission on December

23   4th, 2001.  This hearing is concluded.

24

1                    C E R T I F I C A T E

2          I, Suzanne M. Bruce, RPR/CSR, do hereby certify

3     that the foregoing hearing in the Matter of the

4     Suffolk County Sheriff's Department and AFSCME,

5     Council 93 is a true and accurate transcription of

6     the tape provided to me by the Commission, and

7     completed to the best of my ability.

8

9

10

11                   Suzanne M. Bruce, RPR/CSR

12

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT 8

Volume I
Pages  1-32

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


- - - - - - - - - - - - - - - - - x
GIUSEPPE MAROTTA,

          Plaintiff

vs.

SUFFOLK COUNTY,

          Defendant
- - - - - - - - - - - - - - - - - x



          DEPOSITION of MAURA McDONOUGH, a witness
called on behalf of the Plaintiff, taken pursuant to the
Federal Rules of Civil Procedure, before Kathleen A.
Gardner, Registered Professional Reporter and Notary
Public in and for the Commonwealth of Massachusetts, at
the Suffolk County House of Correction, 20 Bradston
Street, Boston, Massachusetts, on Wednesday, June 27,
2007, commencing at 12:40 p.m.


                    _____


                    KATHLEEN A. GARDNER
              Registered Professional Reporter
                    11 Roman Avenue
              Danvers, Massachusetts 01923

        Phone:  978-777-3574 / FAX:  978-750-8342

```
 1  APPEARANCES:

 2    DANIEL W. RICE, ESQ.
        Glynn, Landry, Harrington & Rice, LLP
 3      10 Forbes Road
        Braintree, Massachusetts 02184
 4      for the Plaintiff.

 5    Russell T. Homsy, Esq.
        Suffolk County Sheriff's Department
 6      House of Correction
        20 Bradson Street
 7      Boston, Massachusetts 02118
        for the Defendant.

 8

 9                    _____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1    going to represent to you it's a cover page and then

2    selected pages of a transcript of a hearing at the

3    Labor Relations Commission, starting with your

4    testimony.

5 A.   Okay.

6 Q.   If you would just briefly look it over and just make

7    sure it's the same thing that I e-mailed you.

8 A.   (Examining document.)  Yes, it is.

9 Q.   Having reviewed your testimony from the Labor

10    Relations Commission in the transcript that I have

11    before you, was the testimony you gave at that time

12    accurate?

13 A.   Yes.  I mean -- yes.

14 Q.   Did you see anything in there that you'd want to

15    change as far as your answers go?

16 A.   One thing that's going to seem silly, but it's -- I

17    just misspoke in one part, and it's --

18 Q.   You can take your time and find it.

19 A.   (Examining document.)  I can't find it.  At one

20    point I say -- I think it's overtime is times hours,

21    and of course that's ridiculous.  I can't find it

22    now.

23         But other than that, yes, this is what I

24    said, and I don't have anything to change.

1 Q.  All right.  So with the exception of that, would you

2      state on the record here that you adopt all the

3      responses that you gave to the questions at the

4      Labor Relations Commission hearing?

5 A.  Yes.

6 Q.  I'm going to -- I think that saves us quite a bit of

7      time, but I'm going to ask you a few other

8      questions.

9           Having read the transcript, do you recall

10     that in or about the end of 1999, beginning of 2000,

11     that the Sheriff's Department converted the way it

12     paid employees from using an in-house system called

13     Data Ease, I believe, to PeopleSoft?

14 A.  Yes.

15 Q.  Did that have some impact on the manner in which

16     overtime was calculated for unionized employees here

17     at the House of Correction?

18 A.  Yes.

19 Q.  What impact did that have?

20 A.  I guess, honestly, back then when I gave this

21     testimony, I had a much better understanding of the

22     differences.  I mean, to give it now would be giving

23     it on my memory.

24           I think I explain it in here, so if you have

1 Q.  Okay.  How did you become aware of that?

2 A.  In this -- and I recall the conversation -- Paul

3       Fahey came into my office the very first check he

4       got; and he was not the only one, but he was the

5       first.  He was rather vocal, and right in there with

6       the jail with me, which is where I worked at the

7       time.

8             So he was the first one to bring it to my

9       attention.  When I looked myself in the system, I

10      did a double-check for all the unions, and it was

11      the same across the board.  It was the regular rate

12      times 1.5.

13 Q.  Okay.  Now, at this point you were the Assistant

14      Director of Personnel?

15 A.  Yes.

16 Q.  Okay.  And as a result of Paul Fahey and others

17      complaining, what did you do?

18 A.  I contacted City Hall and asked them about it.

19      There was a team, sort of dually led by Sally Glora

20      and Anderson Consulting.  She was the city auditor,

21      and she was sort of the lead on the whole conversion

22      project, and then Anderson Consulting was obviously

23      an outside consulting agency that came in.

24            So there was a team, and I notified that

1    team that the overtime rate was just 1.5 and didn't

2    include differentials.

3 Q.   Were you concerned that the overtime rate did not as

4      it was being paid, the 1.5 without the

5      differentials, that that violated the Fair Labor

6      Standards Act?

7 A.   I was concerned enough that I wanted them to

8      research it, and I wanted our own internal attorneys

9      to research it, yes.

10 Q.  Okay.  And was there research done?

11 A.  Yes.

12 Q.  At some point did you become aware or did you

13     conclude that the way of calculating overtime, which

14     is, I think you said, 1.5 times the regular rate of

15     pay without the differentials, that that violated

16     the Fair Labor Standards Act?

17 A.  No, and I can tell you why.  The Fair Labor

18     Standards Act states that you have to pay overtime

19     if someone works more than 40 hours, and then the

20     overtime rate kicks in.

21         We paid overtime -- based on the contracts,

22     we paid overtime even if you called in sick a day,

23     so you only actually worked 32 hours.  We would pay

24     you overtime if you worked an overtime shift even if

Page 16

1  Q.  I'm going to show you another exhibit.  I don't have

2      this stapled.  We'll have this one marked.

3              (Exhibit 2 marked for identification.)

4  Q.  I apologize for the lack of staples, but this

5      is what we have marked as Exhibit 2, and it's a memo

6      to Charles Abate from Michael Cawley dated October

7      5th, 2000; and I'll represent to you that

8      Mr. Cawley, the author of this, goes through a

9      history of FLSA calculations.

10 A.  (Examining document.)  I'm familiar with this.  I

11     helped draft this.  So they were not getting

12     differentials.

13              MR. HOMSY:  Is there a question?

14 Q.  Do you need a few seconds to read this over?

15 A.  Sure.  (Examining document.)  Yes.

16 Q.  Okay.  So just a couple questions about this memo.

17              On the first page, under the first heading,

18     a sentence is written -- well, it's under the

19     heading "FLSA Calculations Prior to PeopleSoft."

20 A.  Yes.

21 Q.  The last sentence says, "The FLSA rate included

22     payments received for regular hours worked and

23     differentials."

24 A.  Yes.

1 Q.  And when the FLSA rate is referred to in this memo,

2     it's referring to the overtime rate?

3 A.  Yes.

4 Q.  Now, after the conversion to PeopleSoft, the

5     differentials were not included in the overtime

6     rate, correct?

7 A.  That is true.

8 Q.  Then there are recommendations given in the memo?

9 A.  Mmm-hmm.

10 Q.  Turning to the last page, which is Option 2, I'm

11     going to read the paragraph, "Option 2--Follow the

12     strict guidelines of the FLSA in calculating OT

13     rates.  Under this scenario, the OT rate would

14     include the regular wages and all differentials.

15     The wellness money would also have to be included in

16     this rate."  Did I read that accurately?

17 A.  Yes.

18 Q.  Okay.  When you were involved in writing this memo,

19     was it your understanding that the FLSA rate

20     required that all differentials be included in the

21     OT rate?

22 A.  Could you ask that question again?

23 Q.  When you were involved in writing this memo, and

24     having had this sentence read to you, I'm asking if

Page 18

1     it was in fact your understanding that the FLSA

2     required the OT rate to include the regular wages

3     and all differentials.

4  A.  I guess the way it was explained to me is it had

5     to -- the wording in the law states it has to be at

6     least your wages and your differentials, at least.

7     You'll have to read FLSA.

8            MR. HOMSY:  I just want to clarify for the

9     record.  Is she guessing?  She just said, "I guess."

10           MR. RICE:  I can ask the question in a

11     different way.

12  Q.  Do you disagree with the statement under Option 2

13     which says this:  "Under this scenario" -- "Follow

14     the strict guidelines of the FLSA in calculating OT

15     rates.  Under this scenario, the OT rate would

16     include the regular wages and all differentials"?

17  A.  Yes.

18           MR. HOMSY:  Try not to start answering the

19     question before he stops talking.  She can't take it

20     down.

21           THE WITNESS:  Sorry.

22  A.  Yes.

23  Q.  By the way, what's wellness money?

24  A.  They have a fitness test.  It's sort of a bonus.

Page 22

1 Q.  The Fair Labor -- I'll strike that question.

2           I'm going to show you another document.

3           (Exhibit 3 marked for identification.)

4 Q.  I've got another document for you, which we've

5     marked as Exhibit 3; and for the record, I'll

6     represent that it appears to be an e-mail from you

7     to somebody named Denise Jordan; Subject:  OT Rate

8     (FLSA) dated March 9th, 2000.  And it looks like

9     there's an Excel spread sheet that was attached,

10    which I don't have.

11 A.  (Examining document.)  That would have been a

12    retroactive -- other pay.  We must have -- I'm

13    guessing, but we must have signed a contract, and

14    that's the retroactive pay for the differentials

15    that -- that's a guess.  I don't know.

16 Q.  Okay.  So let's just go through the e-mail.

17           In the second sentence of the first

18    paragraph -- excuse me -- the first sentence of the

19    second paragraph, you write, "I think it is a good

20    example of the overtime issue we discussed at the

21    meeting a couple of weeks ago."

22           Do you recall having a discussion with

23    Denise Jordan about an overtime issue?

24 A.  No, but I see no reason I would have lied.

Page 23

1 Q.  Does it refresh your memory that in or around the

2     March 9th, 2000, time frame, you were concerned that

3     the OT rate for employees was not being calculated

4     in accordance with the Fair Labor Standards Act?

5 A.  Can I just see if I can understand this e-mail first

6     for one second?

7 Q.  Sure.

8 A.  (Examining document.)  Okay.  Your question?

9          MR. RICE:  Can you read it back?  I forgot

10    my question.

11         (The question on Lines 1 to 4 was read by

12         the court reporter.)

13 A.  It was -- it was my fear that it was not being

14    calculated the same way it was under Data Ease.

15 Q.  And was your fear that -- and I'm reading the next

16    or another sentence from this.  "No differentials or

17    prior OT is reflected in the actual overtime rate."

18 A.  Yes.

19 Q.  I'm going to show you another exhibit.

20         (Exhibit 4 marked for identification.)

21 Q.  I am placing another document before you, which is

22    an exhibit that we've marked as Exhibit 4.  And for

23    the record, I'll represent that this appears to be

24    an e-mail from Maura McDonough to Pat Murphy, COB

Page 24

1     BAISP, dated April 10th.

2 A.   Yes.

3 Q.   Do you remember sending this e-mail?

4 A.   Yes, I do.

5           MR. HOMSY:  Don't talk until he's done.  She

6     can't take it down.

7           THE WITNESS:  Sorry.

8 Q.   In it, you pose a question.  First of all,

9     Mr. Murphy, who is he?

10 A.  It's Miss Patricia Murphy.

11 Q.  And who is she?

12 A.  She is -- she was sort of co-lead with Sally Glora,

13    and her function -- you know, Sally was the city

14    auditor.  Pat Murphy was sort of the IT specialist.

15    She was more on the IT side of that project.

16 Q.  And you pose a question in this e-mail.  You pose

17    two questions, but the first one is this:  "Do you

18    have any idea when the overtime will reflect FLSA?"

19 A.  Yes.

20 Q.  Were you concerned when you posed that question that

21    the overtime did not reflect FLSA?

22 A.  Yes.

23 Q.  Were you concerned that FLSA was not reflected

24    because the differentials were not being included in

Page 28

1 A.  Yes.

2 Q.  And that was dismissed because the union was

3     determined to have not filed it within the statute

4     of limitations at the Labor Relations Commission?

5 A.  I got -- I don't think I've ever even read that

6     decision.  I think I left before that decision came

7     down, but that is my understanding.

8          I've spoken to people since, and it is my

9     opinion that, yes, we did win that for that reason.

10 Q. Why didn't -- if you know, why didn't the Sheriff's

11    Department accede to the union's demand that the

12    differentials be put back into the overtime

13    calculations again like they were before the

14    conversion?

15 A. My understanding is it was impossible -- if not

16    impossible, then extremely, extremely difficult and

17    time-consuming.

18          The amount of work I did to fix all of these

19    problems was enormous.  It was my life's work for

20    two years.  So it was by no means lack of effort.

21    But there were certain things -- and it wasn't FLSA,

22    again.  It was -- what the union wanted was we want

23    our differential -- "We want our OT pay to reflect

24    exactly what Data Ease paid."  That was what I

Page 29

1    always heard from them.  "We want to go back to the

2    old way."  There wasn't much wiggle room there.

3            We said, "Well, as long as we're in

4    compliance with the contract and with FLSA, you

5    know, that's what we think we can do, and that's

6    what we're going to continue to work towards.  If we

7    can make it be identical to Data Ease, that's

8    fantastic, and we'll work towards that as well."

9    But it was never just "Oh, we're not going to do

10   that for you."  That was never the response that

11   they got ever.

12 Q.  Now, were you aware that there were other bargaining

13   units whose payroll were being handled by the City

14   of Boston who had similar issues with the

15   conversion?

16 A.  Yes.

17 Q.  Did you become aware at any point that individual

18   employees collectively brought claims in Federal

19   Court alleging that their rights under the Fair

20   Labor Standards Act had been violated as a result of

21   how the conversion had affected their overtime pay?

22 A.  I knew the police had some sort of lawsuit going on

23   because I worked closely with Mary Ryan.  I don't

24   know what venue they went before.

# EXHIBIT 9

## Maura McDonough, House of Corrections

| | |
|---|---|
| **From:** | Maura McDonough, House of Corrections |
| **Sent:** | Thursday, March 09, 2000 10:59 AM |
| **To:** | Denise Jordan, COB BAISP |
| **Subject:** | OT rate (FSLA) |

Denise,

This is a report that I received to calculate Retro for WG404, 405, 403.

I think it is a good example of the Overtime issue we discussed at the meeting a couple of weeks ago. As you can see for a regular day at one rate, the OT rate for that same person is the regular rate * 1.5. The far right column states dollar amount paid and it does not reflect a special accumulator. No differentials or prior OT is reflected in the actual OT rate. This is the case with all workgroups but they were not getting retro so I do not have a report of their time paid. I can get examples for you if you need them.

Please let me know what you think and/or if you need more information.

Thank you,



Sheriff 2-24 Oth Pay
Maura              Retro.xls...

    -----Original Message-----
| | |
|---|---|
| **From:** | **Denise Jordan, COB BAISP** |
| **Sent:** | Thursday, March 09, 2000 10:40 AM |
| **To:** | Maura McDonough, House of Corrections |
| **Cc:** | Judd Nielsen, AC BAISP |
| **Subject:** | RE: WG403 Div Manager |

Maura,
SHFHN(Sheriff Head Nurse) at the rate of $0.50 has been created for WG403 effective 3/11/00.
SHFDM(Division Manager) at the rate of $0.15 for WG403 will be inactive as of 3/11/00.
Denise

        -----Original Message-----
| | |
|---|---|
| **From:** | Maura McDonough, House of Corrections |
| **Sent:** | Monday, March 06, 2000 9:22 AM |
| **To:** | Denise Jordan, COB BAISP |
| **Subject:** | WG403 Div Manager |

The new time reporting code should be SHFHN (Sheriff Head Nurse) at the rate of $0.50 per hour.

Thank you
Maura

1

# EXHIBIT 10

EXHIBIT

Nr #17

## Maura McDonough, House of Corrections

| | |
|---|---|
| **From:** | Maura McDonough, House of Corrections |
| **Sent:** | Monday, April 10, 2000 3:00 PM |
| **To:** | Pat Murphy, COB BAISP |
| **Subject:** | Questions |

Do you have any idea when the Overtime will reflect FLSA?  When Weekend Differential will be automatic?

Thank you
Maura

1

# EXHIBIT 11

# COMMONWEALTH OF MASSACHUSETTS
## BEFORE THE LABOR RELATIONS COMMISSION

In the Matter of }
AFSCME, Council 93, }
}
}                                Case Number MUP 01-2911
}
and }
}
Suffolk County Sheriff }
}

## AFFIDAVIT OF THOMAS YOTTS

I, Thomas Yotts, do state under the pains and penalties of perjury that the following is true to the best of my knowledge and belief:

1.  My name is Thomas Yotts. I am Chief Financial Officer for the Suffolk County Sheriff's Department. I have held this post since 1986. As Chief Financial Officer, I am responsible for financial operations of the Suffolk County Sheriff's Department. The funding of the Sheriff's Department comes from the City of Boston.

2.  One of my responsibilities is to participate in the collective bargaining process with the seven union locals.

3.  In late 1999 the Sheriff's Department, along with all other Departments for the City of Boston, converted to one central payroll system. The mandated change to the "peoplesoft" system resulted in a number of payroll issues.

4.  One issue that has remained unresolved is the calculation of overtime for certain Sheriff's Department employees.

5.  The new system does not automatically include differentials paid to certain employees in calculating the overtime rate.

6.  I have been involved in discussions of this issue with the Union.

7.  The new system complies with the Fair Labor Standards Act.

8.  I am in the process of compiling data that compares the new system, the old system and the Fair Labor Standards Act.

9.    Once the comparison is completed, the Department and the Union will be better informed in bargaining the impact of the change.

Signed under the pains and penalties of perjury this _19th_ day of March 2001.

Thomas Yotts